**SOUTHEASTERN CANTEEN CO. and Canteen Service Co. of Toledo, Petitioners on Review,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent on Review.**

**Nos. 18419, 18420.**

United States Court of Appeals
Sixth Circuit.

May 13, 1969.

616

John C. Straub, Toledo, Ohio, for petitioners; John J. Kendrick, John C. Straub, Toledo, Ohio, on brief; Shumaker, Loop & Kendrick, Toledo, Ohio, of counsel.

Chester C. Davenport, Atty., Dept. of Justice, Washington, D. C., for respondent; Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., on brief.

Before WEICK, Chief Judge, and O'SULLIVAN and PHILLIPS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Petitioners, Southeastern Canteen Co. and Canteen Service Co. of Toledo petition for our review of a decision of the Tax Court, entered September 19, 1967, upholding the Respondent-Commissioner's assessment of deficiencies in income tax in the amounts of $16,589.82 and

$58,863.73, respectively. These deficiencies arose primarily from disallowance of parts of deductions from income taken by taxpayer corporations for rent and commissions paid by them to the then owner of the equipment used by taxpayers, and from disallowance of Southeastern Canteen Co.'s claim of corporate exemption from surtax on the first $25,000 of its earnings. Reason for these rulings was provided by a finding that the disallowed rent and commissions paid were not "ordinary and necessary expenses paid or incurred * * * in carrying on" the taxpayers' trade or business, within the meaning of the Internal Revenue Code of 1954, 26 U.S.C. § 162 (a). Disallowance of the exemption from surtax of the first $25,000 of Southeastern Canteen Co. earnings, 26 U.S.C. § 11(d), was the product of the Tax Court's finding that Southeastern Canteen Co. was formed by the owners of Canteen Service Co. with the principal purpose of securing the surtax exemption of $25,000 of its earnings, contrary to Section 269 of the Internal Revenue Code of 1954, 26 U.S.C. § 269.

We agree with the Tax Court's affirmance of the Commissioner's disallowance of amounts claimed as rent and other business expenses. We reverse its holding which denied Southeastern Canteen Co.'s use of the surtax exemption.

The Tax Court decision, filed September 19, 1967, is reported as Southeastern Canteen Co. and Canteen Service Co. of Toledo v. Comm'r, 36 P–H Tax Ct.Mem. 973, ¶ 67,183 (1967). The factual history is complicated. Buddies Box Lunch, Inc. was formed as an Ohio corporation on July 16, 1931. The outstanding capital stock was owned fifty percent by Virgil A. Gladieux and fifty percent by his brother, Nelson Gladieux. In 1955, Virgil became sole stockholder and in 1960 the corporate name was changed to Gladieux Corporation (hereinafter Gladco). Gladco was principally engaged in the operation of cafeterias and lunch counters and the dispensing of food in several manufacturing plants in Toledo, Ohio. It also sold candy, gum and nuts both at its lunch counters and through vending machines at locations in and near Toledo.

Canteen Service Co. of Toledo was incorporated as an Ohio corporation on March 16, 1946, and was principally engaged in the operation of vending machines in Lucas, Fulton and Wood counties in Northwestern Ohio under a franchise granted by Automatic Canteen Company of America (hereinafter Automatic). Its sole shareholder was Ben T. Handwork. On May 10, 1946, Gladco entered into an agreement with Canteen. Service whereby Gladco transferred to Canteen Service its vending machine business in exchange for payment of location commissions on all gross sales of candy, gum and nuts sold through vending machines previously operated by Gladco and at all locations where Gladco then operated food dispensing facilities. Gladco, pursuant to an option in the agreement, purchased seventy-five percent of Canteen Service's stock on or before October 31, 1946. Later, as a result of redemption of Handwork's remaining twenty-five percent stock interest, Gladco became the sole owner of Canteen Service.

Southeastern Canteen Co. was incorporated as a Michigan corporation on January 19, 1956. Its business was the same as Canteen Service's—the sale of food and beverages through vending machines under a franchise granted by Automatic—but the territory of the business was Lenawee and Monroe counties in southeastern Michigan. Southeastern issued twenty shares of stock—fifteen to Virgil Gladieux and five to Ben Handwork. In 1959, Southeastern redeemed Handwork's stock, with Gladieux thereby becoming sole stockholder.

Thus, by 1960 Canteen Service Co., an Ohio corporation, was wholly owned by the Gladieux Corporation (Gladco) and the corporate shares of Gladco and Southeastern, the Michigan corporation, were wholly owned by Virgil T. Gladieux. Virgil and his wife, Beatrice G. Gladieux, were also the sole shareholders in twelve other corporations engaged in the mer-

chandising and vending of food, beverages and gum in various areas of the United States. On June 30, 1960, Virgil and his wife agreed to transfer all fifteen corporations to ABC Vending Corporation, a large publicly owned Delaware corporation, in exchange for 80,000 shares of its stock, an option to purchase 5,000 additional shares and an executive position with ABC at an annual salary of $62,500.[1] The franchise agreements which Canteen Service and Southeastern had with Automatic, however, gave Automatic a right to withhold consent to a transfer of Canteen Service or Southeastern.[2] Automatic exercised this right and refused to permit the transfer of either comany to ABC. Virgil Gladieux's arrangement to circumvent this refusal brought about most of the litigation before us.

Prevented from total performance of the June 30, 1960 agreement, Virgil, on January 26, 1961, by "Supplemental Agreement" transferred to ABC his other thirteen corporations, including Gladco, in exchange for 68,500 shares of stock, the stock option, and the executive position with ABC.[3] There were also negotiated, as of January 31, 1961, agreements between Gladco (then owned by ABC) and Canteen Service (controlled by Virgil Gladieux), and between Gladco and Southeastern (still controlled by Virgil). The terms of these latter agreements were substantially as follows: Canteen Service and Southeastern (petitioners) would transfer to Gladco their tangible physical assets at a price determined by their net book value as of October 1, 1960. Gladco would then lease back to petitioners all such assets for a term of twenty years, beginning October 1, 1960, and would lease to peti-

tioners "all additional equipment necessary for the operation of the vending machine business." Petitioners would pay to Gladco for such leased assets a "rental" equal to ten percent of their gross sales attributable to the vending machine business during the term of the lease, provided such "rental" did not create a deficit in the net income of either petitioner. Petitioners would pay increased "fixed location commissions" to Gladco with respect to all sales at vending machine locations derived through Gladco, Virgil or any affiliated corporations. In consideration for the transfer of their physical assets, Gladco paid to Canteen Service and Southeastern $184,659.85 and $5,109.43, respectively. All of this money was used, along with $201,827.30 and $52,863.64, respectively, out of their other funds, to purchase 11,500 shares of ABC stock in the spring of 1961. By this purchase, Virgil then held, directly or indirectly, the 80,000 shares of stock he would have acquired had the original agreement not been blocked by Automatic.

The Commissioner made the following deficiency assessments: against Canteen Service Co. of Toledo and Southeastern, together, $58,863.71 for the tax year ending September 30, 1961;[4] against Southeastern Canteen Co. (the Michigan corporation), $4,936.82, $5,458.89 and $6,194.61 for the tax years ending October 3, 1959, October 1, 1960, and September 30, 1961, respectively.[5]

We consider then, 1) disallowance of rental payments made by petitioners to Gladco, 2) disallowance of location commissions paid by petitioners to Gladco, and 3) disallowance of surtax exemption claimed by Southeastern.

---

1. ABC, at the time, had 8,522 shareholders owning 1,228,328 shares of common stock including 48,960 treasury shares.

2. Article V, Section 25 of Franchise Agreement.

3. The six-month delay in negotiations was caused by the fact that Automatic's refusal to consent was submitted to arbitration, and the arbitrator's decision (in Au-

tomatic's favor) was not rendered until December 27, 1960.

4. This amount represents the disallowance of a portion of the rental and location commission deductions taken by Canteen Service and Southeastern.

5. These were the consequence of disallowing Southeastern's surtax exemption for the mentioned years.

### 1) Purported Rental Payments.

For their fiscal year ending September 30, 1961, petitioners Canteen Service and Southeastern claimed deductions of $121,172.15 and $12,211.30, respectively, for amounts paid as rent to Gladco pursuant to the sale-leaseback agreement of January 31, 1961. These deductions were claimed under Section 162(a) (3) of the Internal Revenue Code of 1954, 26 U.S.C. § 162(a) (3), which reads in pertinent part as follows:

"(a) There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

The Commissioner, however, disallowed petitioners' claimed deductions to the extent that they exceeded $53,592.79 and $1,906.59, respectively. He based his determination on the conclusions that the sale-leaseback agreement was not negotiated at arm's length between adverse parties and that the claimed rentals did not represent the fair rental value of the assets leased. The fact that the parties designated, and one party became obligated to pay to the other, a specified amount as rent does not bind the government to treat that amount as rent. Catherine G. Armston, 12 T.C. 539, 548 (1949), aff'd sub nom. W. H. Armston Co., Inc. v. Comm'r of Internal Revenue, 188 F.2d 531, 533 (5th Cir. 1951). Where there is an absence of arm's length dealing, the Commissioner may inquire into what constitutes reasonable rental to determine whether the amount paid exceeds what would have been paid had the parties dealt at arm's length. Roland P. Place, 17 T.C. 199, 203 (1951), affirmed, 199 F.2d 373 (6th Cir. 1952), cert. denied, 344 U.S. 927, 73 S.Ct. 490, 97 L.Ed. 714 (1953). See also, J. J. Kirk, Inc., 34 T.C. 130 (1960), affirmed 289 F.2d 935 (6th Cir. 1961).[6]

The issue is whether the involved parties negotiated the sale-leaseback agreement at arm's length. This is an issue of fact, and the Tax Court's findings can be reversed only if found to be clearly erroneous. Comm'r of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). We consider that the Court's findings are not clearly erroneous, and agree with the following from the Tax Court's decision:

"The dominant motives of both Virgil and ABC throughout the negotiations which culminated in the sale-leaseback agreements are crystal clear. Virgil sought to obtain ABC stock and an executive position with the company and ABC sought to acquire Virgil's 15 food service companies. In light of these facts, we think it abundantly clear that the sale-leaseback agreements were designed solely to fulfill the personal objectives of Virgil. There was no legitimate business purpose for petitioners to undertake the sale and subsequent leaseback of their tangible assets other than to satisfy Virgil's purpose of shifting income from petitioners to Gladco in order to induce ABC to go through with the deal. Thus, this is not a case where a corporation entered a sale-leaseback arrangement in order to generate needed cash for business expansion. To the contrary, all the money received by petitioners upon the sale of their tangible assets, together with substantial additional amounts, was used to purchase ABC stock, thus serving no meaningful business purpose to petitioners.

6. This power given the Commissioner is but a corollary to the broader proposition that the substance of a transaction rather than the form is controlling. Gregory v.

Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Smith v. Comm'r of Internal Revenue, 370 F.2d 178 (6th Cir. 1966).

"Petitioners' position is further weakened by the fact that during the entire negotiations leading up to the execution of the sale-leaseback agreements, the owner of both the lessor (Gladco) and the lessees (petitioners) was the same person, Virgil Gladieux. Petitioners' attempt to transform such an identity of interest into a relationship which petitioners characterize as adverse, transgresses reasonable imagination. All the more so since the facts show that the sale-leaseback agreements were not intended to be ends in themselves but merely steps in an integrated plan to secure to Virgil and ABC advantages which could not benefit petitioners in any meaningful way. From a review of all the facts bearing on this issue, which have been set out at length in our findings, we are convinced that the sale-leaseback agreements in question were not the result of arm's length negotiation between adverse parties and, therefore, we must determine whether the purported rentals were 'in excess of what the lessee[s] would have been required to pay had * * * [they] dealt at arm's length with a stranger.' Roland P. Place, *supra*."

An important consideration is that Virgil Gladieux was, on the one hand, sole stockholder of the petitioners and, on the other, a stockholder and executive of ABC. It was not essential to him that he profit in his capacity *as owner of the petitioners*, but only that he profit in the sale-leaseback transaction *as a whole*.

■ Petitioners do not squarely raise the contention that, whether or not the involved negotiations and dealings were at arm's length, the rental payments were reasonable. We are not compelled to reach this question but the following, brought to our attention by the government's brief, persuades us that the Tax Court's determination of deficiency was not clearly erroneous:

"Taxpayers argue that the rentals paid were reasonable in light of the fact that the lessor (Gladco) furnished them, with additional equipment for their use. However, even taking this fact into consideration, the record shows that the glaring disparity is still present. For the period October 1, 1960, through October 3, 1964, taxpayer, Southeastern, paid the lessor (Gladco) total rentals of $62,487.98, receiving on the other hand for the period October 1, 1960, through December 27, 1964, additional equipment costing Gladco $12,097.91. For the same periods Canteen Service paid Gladco total rentals of $432,835.18, receiving from Gladco additional equipment costing the latter $595,-591.12. Thus, Southeastern paid Gladco $62,487.98 to lease equipment valued by the parties at $17,207.34 ($5,109.43 sales price plus $12,097.91) and Canteen Service paid Gladco $432,835.18 to lease equipment valued by the parties at $780,250.97 ($184,-659.85 sales price plus $595,591.12). Moreover, an even greater disparity existed for the period October 1, 1960, through December, 1962, with respect to assets costing Gladco a total of $251,197.03 which were rented to Canteen Service for $208,176.58 as of September 29, 1962."

### 2) Location Commissions.

In 1946, subsequent to Canteen Service's incorporation, it entered into an agreement with Gladco (then named Buddies Lunch System, Inc.) whereby Gladco transferred to Canteen Service its vending machine business in exchange for payment of location commissions on sales of candy, gum and nuts sold through vending machines previously operated by Gladco or at locations where Gladco then operated food dispensing facilities. At the time, Canteen Service was wholly-owned by Ben Handwork, and Gladco by Virgil and Nelson Gladieux. This 1946 agreement was continued and substantially modified and extended by the January 31, 1961 agreement between Canteen Service (then controlled by Virgil) and Gladco (then owned by ABC). An agreement of the same date between

Southeastern and Gladco established location commissions payable from Southeastern to Gladco, although there is no evidence of a previous agreement between these parties.

In their fiscal year 1961, Canteen Service and Southeastern paid or accrued to Gladco location commissions of $134,920.68 and $9,174.57, respectively. In their corporate income tax returns for that year, they deducted those amounts as "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business," under Section 162(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 162(a).

Of these amounts, the Commissioner disallowed $74,088.26 and $1,593.84, respectively. $69,429.16 of Canteen Service's disallowance was attributable to the entire location commissions at two large corporations, LOF Glass (Libby-Owens-Ford) and Toledo Scale. The remaining amount disallowed to Canteen—$4,659.10 —and the full amount disallowed to Southeastern constituted excess location commissions computed under the higher rates determined in the January 31, 1961 agreement but applicable retroactively, beginning October 1, 1960, at a time when the 1946 agreement was still in effect.

The Commissioner found, and the Tax Court affirmed, that the disallowed portions of the location commissions were not "ordinary and necessary" business expenses, nor were they "appropriate and helpful" to petitioners' business. See Comm'r of Internal Revenue v. Tellier, 383 U.S. 687, 689, 86 S.Ct. 1118, 16 L.Ed. 2d 185 (1966). With regard to the location commissions at LOF Glass and Toledo Scale, the Tax Court stated:

"[P]rior to the 1961 agreement, imposing increased location commissions on petitioners retroactively to October 1, 1960, Gladco had waived all commission payments due from Canteen Service on the LOF Glass and Toledo Scale business. The waivers as to those commission payments occurred at the time Canteen Service began making location commission payments directly to the industrial clients, LOF Glass and Toledo Scale. Thus, for several years prior to the 1961 agreement, Canteen Service was not required to make any location commission payments to Gladco on its LOF Glass and Toledo Scale business. However, in order for Virgil's deal with ABC to be consummated, it became necessary to shift all income of petitioners to Gladco. To accomplish this objective Canteen Service was required to reinstitute location commission payments to Gladco on its LOF Glass and Toledo Scale business, which was, of course, in addition to the amounts Canteen Service was required to pay Gladco as purported rental payments. We can find no reasonable explanation for reinstituting such location commissions except as a further device to accomplish the shifting of all petitioners' income to Gladco. The record specifically shows that at the time Virgil was negotiating with representatives of ABC, he felt ABC was intending to acquire, by the various agreements all the operating income of petitioners.

"Even more objectionable to allowing Canteen Service's location commissions in question is the fact that not only prior to, but for the year in question, Canteen Service paid location commissions directly to LOF Glass and Toledo Scale for the right to operate vending machines on the premises of those industrial customers. In 1961, Canteen Service paid to those customers the combined amount of $12,401.70 in location commissions. In spite of this, petitioners contend that they are entitled to deduct the further amount of $69,429.16 paid to Gladco as location commissions for vending machine sales on the premises of the same two customers. The record fails to reflect any business or economic need for Canteen Service to make the location commission payments in question, and in light of the fact that Canteen Service was already making payments directly to LOF Glass and Toledo Scale, we know of none. Lacking in

any meaningful business purpose we fail to see how the payment of such obviously unnecessary amounts could be 'appropriate and helpful' for the development of Canteen Service's business."

With regard to the additional, retroactive commissions, the Court found that the Commissioner had disallowed only that amount which,

"exceeded the commissions computed pursuant to the rates in effect under the agreement between Canteen Service and Gladco, dated May 10, 1946. Thus, for the period October 1, 1960, through February 20, 1961, respondent disallowed only $4,659.10 out of $25,-999.22 claimed by Canteen Service and disallowed $1,593.84 out of $3,558.36 claimed by Southeastern. Since respondent has allowed petitioners' claimed location commissions, although at the lower rates in effect prior to the 1961 agreements, the only question presented is whether respondent correctly disallowed the retroactive increases required by the 1961 agreements.

"Petitioners contend that the location commissions were made retroactive to October 1, 1960, because that was the date, originally contemplated by ABC and Virgil in their agreement of June 30, 1960, when the exchange of Virgil's 15 companies was to be made in return for ABC stock. This fact is apparently relied upon by petitioners to justify making the commission payments retroactive to October 1, 1960. Even conceding that the October 1 date was set for that purpose, which the record does not necessarily support, we think petitioners' position is irrelevant with regard to the payment of location commissions by Canteen Service and Southeastern inasmuch as the limited question for our determination is whether the retroactive payments constituted ordinary and necessary business expenses to petitioners. Thus, while the October 1 date may have been required in order for Virgil to consummate his deal with ABC, we find no valid business reason in the record for petitioners to retroactively pay increased location commissions for more than 4 months. The record is devoid of any meaningful economic benefit flowing to petitioners for such payments, and consistent with our prior determination, *supra*, we think the retroactively increased rates imposed upon petitioners under their 1961 agreements with Gladco merely constituted a necessary concession on Virgil's part, in order to consummate his personal deal with ABC, irrespective of whether such a result proved 'appropriate and helpful' for the development of petitioners' business."

■■ The question of whether these claimed deductions come within Section 162(a) is a factual determination. Comm'r of Internal Revenue v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 88 L.Ed. 171, 177 (1943). It is thus reversible only if clearly erroneous. Comm'r of Internal Revenue v. Duberstein, *supra*. We are of the opinion that the Tax Court's findings and conclusions in this regard are not clearly erroneous.

Petitioners' principal argument is that the location commissions were adopted by the 1946 agreement negotiated at arm's length between Canteen Service and Gladco which were, at that time, owned by separate, unrelated parties. The 1946 agreement covered only commissions on candy, gum and nuts. The 1961 agreements encompassed commissions on seven additional items: coffee, pastry, milk, ice cream, sandwiches, hot foods, and cigarettes. The 1946 agreement was not merely "supplemented" by the 1961 agreement, as petitioners argue, but was broadened and extended manyfold. It cannot be considered an erroneous finding that the disallowed location commissions were derived from the 1961 agreements and failed to serve an excludable business purpose.

3) Denial of Surtax Exemption.

In 1956 Southeastern Canteen Co. was organized as a Michigan corporation by Virgil Gladieux and Ben T. Handwork,

who then were the owners of Canteen Service Co. of Toledo. Later Virgil Gladieux became its sole shareholder. Section 11 of the Internal Revenue Code of 1954, 26 U.S.C. § 11, imposes a tax on the taxable income of corporations consisting of a normal tax and a surtax. Under Section 11(d), the surtax is not imposed upon the first $25,000 of a corporation's taxable income. Both Canteen Service and Southeastern had claimed this $25,000 surtax exemption each year. The Commissioner, however, determined that Southeastern—which engaged in the same business as Canteen but in two Southeastern Michigan counties while Canteen operated in Northwest Ohio— was not entitled to the surtax exemption for its fiscal years ending October 3, 1959, October 1, 1960, and September 30, 1961, on the authority of Section 269(a) of the Code, 26 U.S.C. § 269(a), which reads in pertinent part:

"In general—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation,

\*    \*    \*    \*    \*    \*

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

Specifically, the Commissioner found that Virgil Gladieux and Ben Handwork, sole stockholders in Canteen Service, in 1956 formed or "acquired" Southeastern, of which they became sole stockholders, for the principal purpose of gaining a second $25,000 surtax exemption.

The Tax Court affirmed this determination, stating, "Upon a consideration of the entire record, we think the facts require us to hold that Southeastern was incorporated in 1956 for the principal purpose of avoiding Federal income taxes \* \* \*."

▆ The issue, then, is whether the "principal purpose" of Southeastern's acquisition was "avoidance of Federal income tax." "Principal purpose" is further defined by Treasury Regulations, Section 1.269–3(a), 26 C.F.R. § 1.269–3 (a), as follows:

"If the purpose to evade or avoid Federal income tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of Section 269 which would not have been made if the evasion or avoidance purpose was not present. The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom."

This issue involves a factual determination which can be reversed only if found to be clearly erroneous. Comm'r of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190 (1960). The Commissioner's disallowance of the surtax exemption is presumptively correct, and the burden of disproving such determination by a preponderance of the evidence is on petitioners. 26 C.F.R. § 1.269–5; Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212, 215 (1933); Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623, 629 (1935).

▆ We believe, however, that petitioners met their burden of proving by a preponderance of the evidence that the principal purpose of forming Southeastern was not tax avoidance. At trial before the Tax Court, the sole witness to testify on this issue was Virgil Gladieux, controlling stockholder of both

Canteen Service and Southeastern at the time in question. Gladieux testified that no consideration to Federal income tax law was given at the time of Southeastern's incorporation,[7] and that the reason for a separate corporation was that "we needed identity, local identity, and we needed a Michigan image." Respondent urges that neither this Court nor the Tax Court is bound to accept the testimony of Gladieux, an interested party, even though not contradicted, citing *Quock Ting v. United States*, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501 (1891). But this is not to say that clear, convincing and uncontradicted testimony can be ignored just because of the interest of the witness. The correct rule is recited in *Quock Ting*:

> "Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony." 140 U.S. at 420, 11 S.Ct. at 734.

Gladieux's testimony went unchallenged by the government. This Court has held that "where unimpeached, competent, and relevant testimony on behalf of a taxpayer is uncontradicted, it may not be arbitrarily discredited and disregarded, and the Tax Court cannot reject or ignore this evidence * * *." Loesch & Green Const. Co. v. Comm'r of Internal Revenue, 211 F.2d 210, 212 (6th Cir. 1954). See also, Tank v. Comm'r of Internal Revenue, 270 F.2d 477, 487 (6th Cir. 1959). The Treasury Regulations indicate that "a scrutiny of the entire circumstances" surrounding the acquisition must be made. 26 C.F.R. § 1.269–3(a). Obeying such Regulations, we are persuaded that a review of the "entire circumstances" substantiates Gladieux's testimony. Southeastern was given a sep-

arate "Michigan image" by Gladieux. Books and records of Canteen Service and Southeastern were kept separate and distinct. There were separate warehouses and bank accounts in Michigan. None of Canteen's inventory was used in Southeastern's operations. Southeastern's two resident managers were based in Adrian and Monroe, Michigan—the county seats of the two Michigan counties Southeastern serviced—rather than in Toledo where Canteen's headquarters was located. Virgil Gladieux had established a tradition of incorporating a new company whenever he initiated a new, albeit related, enterprise. In 1961 he controlled a total of fifteen corporations, all engaged in the food distribution business. For example, *Ohio* corporations, controlled by Gladieux, operated in-plant feeding at corporations in *Ohio* whose vending machines were serviced by Canteen Service, but in-plant feeding at the Revco Corporation plant in Deerfield, *Michigan*—in the vending machine territory of Southeastern—was performed by Buddies Lunch System, a Gladieux-controlled *Michigan* corporation.

The Tax Court sought to tarnish Gladieux's "Michigan image" argument by noting that "the franchise agreement under which Southeastern obtained virtually all its vending machines, specifically prohibited Southeastern from using its name on the vending machines in a manner which would give the appearance that Southeastern was the *owner* of the machines." (Emphasis supplied.) The franchise agreement, however, permitted Southeastern to advertise on the machines that it was *servicing* them. In this way, Southeastern was able to effectively present a "Michigan image" to the public.

A recent Court of Claims case parallels the instant case in some respects. In Louisville Store of Liberty, Ky., Inc. v. United States, 376 F.2d 314, 179 Ct.Cl. 847 (1967), a partnership consisting of

---

7. The attorney employed by Gladieux in incorporating Southeastern, a Mr. Smith, was deceased at the time of hearing.

five related partners owned thirteen clothing stores in nine Kentucky towns. In 1959, the partners incorporated eleven of the stores in eleven separate corporations. The Commissioner, relying on Section 269, allowed but one surtax exemption to the entire group of corporations. The Court of Claims, adopting the opinion of Court Commissioner Day, determined that the purpose of incorporation of the companies was not principally to avoid tax within the meaning of Section 269, and held that each company was entitled to the benefit of the $25,000 surtax exemption. The Commissioner's opinion agreed with the United States Senate Finance Committee that, where *corporations controlled by the same persons engage in the same type business in different geographic locations*, there are legitimate business reasons for establishing separate corporations.

"Congress, in considering the Revenue Act of 1964, reviewed the application of the provisions of section 269, concluding that there were indeed legitimate business reasons in the use of multiple corporations where corporations owned or controlled by the same interests, as here, conduct the same type of business in different geographical locales, as here. The Senate Finance Committee made the following comment in this connection:

\* \* \* \* \* \*

" 'While the House and your committee recognize the advantages of use of multiple corporations, it is believed, as it has been in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type business in different geographical locales, there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of use of multiple surtax exemptions. However, the House and your committee do not intend to encourage the formation of these multiple corporations and there-

fore propose to apply higher tax rates to corporations which are members of an affiliated group of corporations. Of course, nothing in this bill is intended as changing the application of sections 269, 1551, or 482 if the multiple corporation form of organization is adopted to avoid taxes.'

\* \* \* \* \* \*

"Sen.Rep. 830, 88th Cong.2d Sess., pp. 149–150, Cum.Bull. 1964–1 (Part 2) pp. 653–654.

"The House Ways and Means Committee adopted similar language in its report on the same subject. See H.R. Rep.No. 749, 88th Cong. 1st Sess.Cum. Bull. 1964–1 (Part 2) p. 242." 376 F.2d at 319.

Such, in substance, were the holdings in Bush Hog Mfg. Co., 42 T.C. 713, 726–729 (1964), and V. H. Monette & Co., 45 T.C. 15, 33–35 (1965), aff'd on other grounds 374 F.2d 116 (4th Cir. 1967).

■ We hold that, under the circumstances where the controlling stockholder of both the parent and acquired corporation testified that the reason for creating a separate corporation to engage in the same business in a different geographic location was to present a local image and was not tax avoidance, where the testimony was uncontroverted and unimpeached, and where there was substantial evidence to corroborate his testimony regarding the presentation of the local image, it was improper for the Commissioner to deny the acquired corporation its $25,000 surtax exemption. To the extent that this holding may be factually inconsistent with the Tax Court's findings of fact, we hold, obedient to Comm'r of Internal Revenue v. Duberstein, *supra,* that its findings are clearly erroneous.

The judgment of the Tax Court sustaining the Commissioner's disallowance of rental and location commission payments is affirmed; the judgment of the Tax Court sustaining the Commissioner's disallowance of the surtax exemption as to Southeastern Canteen Co. is reversed and vacated. Each party shall pay its own costs.