JEFFERSON BLOCK AND SUPPLY COMPANY, PETITIONER *v.* COMMIS-SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2331–71.   Filed February 5, 1973.

---

*A. Benjamin Strand, Jr.*, for the petitioner.

*John B. Harper*, for the respondent.

IRWIN, *Judge:* Respondent determined the following deficiencies in income tax of petitioner and additions to tax:

| Year | Deficiency | Additions to tax sec. 6651(a) |
| --- | --- | --- |
| 3/31/67 | $6, 799. 99 | $340. 00 |
| 3/31/68 | 4, 794. 54 | 239. 73 |
| 3/31/69 | 8, 543. 71 | 854. 37 |

Petitioner has conceded by stipulation that the additions to tax for failure to file timely returns were correctly imposed by respondent. Accordingly, the single issue before us is whether purported rental payments in excess of $3,000 per year made to petitioner's stockholders may be deducted under section 162 [1] either as rent or as compensation for the services of petitioner's president.

FINDINGS OF FACT

Some of the facts have been stipulated and they are so found. The exhibits attached to the stipulation are incorporated herein by this reference.

Petitioner is Jefferson Block & Supply Co., a Tennessee corporation having its principal place of business at all relevant times in Jefferson City, Tenn. For its fiscal year ended March 31, 1967, petitioner filed its corporate income tax return with the district director of internal revenue, Nashville, Tenn.; for the fiscal years ended March 31, 1968, and March 31, 1969, petitioner filed its returns with director of the Internal Revenue Service Center, Chamblee, Ga.

Since its incorporation on January 6, 1955, petitioner has been in the business of manufacturing and selling concrete blocks, ready-mixed concrete, and other concrete building materials in Jefferson County, Tenn., and several neighboring counties.

On June 30, 1963, 320 of petitioner's 400 outstanding shares of stock were owned by W. H. Lackey (Lackey) and his wife. The remaining 80 shares of petitioner's stock were owned in the following manner: 70 by Sue Bird, the Lackeys' daughter; and 10 by Nelson H. Lackey (Nelson), the brother of W. H. Lackey.

During 1961, 1962, and up to July 1, 1963, Lackey was petitioner's president. His duties as president consisted of the general management of the corporation—contracting, overseeing jobs, and handling collections. Lackey's wife was secretary and treasurer. Her duties consisted of bookwork, answering the telephone, and handling office sales.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

Nelson was vice president, and among his duties were the supervision of blockmaking, blockloading, and deliveries, and the supervision of jobs in progress. Phillip Jones, Lackey's son-in-law, was petitioner's yard foreman. Jones' duties were to see that orders for petitioner's products were loaded on the trucks.

In 1962 Lackey suffered an accident which resulted in the amputation of a leg. Following his accident Lackey's wife and brother assumed his duties for a 2- or 3-month period. Upon Lackey's return to work for petitioner following the accident, he discovered that he was unable to manage satisfactorily the affairs of petitioner. Furthermore, as a result of the accident, his wife developed a nervous condition. For these reasons Lackey began to think of disposing of his interest in petitioner. In April or May 1963 Lackey's son-in-law, Phillip Jones, made initial contacts with Dale K. Bettis (Bettis) with regard to purchasing Lackey's interest. Upon learning that Bettis might be interested, Lackey discussed the purchase with Bettis.

After being approached by Lackey, Bettis contacted J. B. High, a certified public accountant and a neighbor of Bettis. High examined petitioner's books and records to determine whether the company was making money and whether it had an adequate cash flow. High determined that petitioner was earning money and was not in serious financial trouble. High did not know of any of the details of the transaction contemplated by Lackey at that time. After High's examination, Bettis agreed to purchase the Lackeys' interests.

On July 1, 1963, Lackey and his wife, Sue Bird, and Nelson conveyed all of their common stock to Bettis and his wife pursuant to an oral agreement. The Bettises gave the following consideration for the conveyance of the stock: (1) A promissory note in the sum of $116,750 payable to W. H. Lackey and Willie D. Lackey in monthly installments of $1,079.83, including interest at 5 percent per annum; (2) a promissory note in the sum of $26,250 payable to Sue Bird in monthly installments of $242.79, including interest at 5 percent per annum; and (3) $3,750 in cash paid to Nelson H. Lackey. The two promissory notes matured 12 years from July 1, 1963.

At the time of the purchase of the stock, Bettis borrowed $25,000 for a downpayment which Lackey requested. Bettis did not try to borrow the total amount ($143,000) of the two promissoy notes given for the purchase of the stock, nor would he have in fact been able to borrow that amount. Of the $25,000 that he did borrow, $18,000 was paid to petitioner for its land and buildings; $3,750 to Nelson for his stock; and $3,250 to W. H. Lackey for his stock. The respective amounts were paid during the end of July 1963.

In an agreement dated July 1, 1963, and notarized July 24, 1963, the Bettises assigned all their common stock in petitioner to Lackey,

as trustee, as collateral security for their two promissory notes given in payment of the purchase price of petitioner's stock. In its pertinent parts, the agreement specifically provided:

1. The Parties of the First Part [Dale K. Bettis and Dolores H. Bettis] do hereby assign, set over and convey to the Party of the Third Part [W. H. Lackey, trustee], as collateral security for said notes all of the capital stock in the Party of the Second Part [petitioner] which they have acquired from the Party of the Third Part and wife and Sue Bird. Said assignment is conditioned, however, upon the failure of the Parties of the First Part to pay said notes when and as they become due and to perform the covenants of this agreement as more fully hereinafter set out.

2. The Parties of the First Part agree that they will pay said notes when and as they become due.

3. The Parties of the First Part and the Party of the Second Part agree that until such time as said notes have been paid in full they will not do any of the following things without the written consent of the Party of the Third Part, to-wit:

(a) They will not declare any dividends by the corporation;

(b) They will not issue any additional capital stock of the corporation;

(c) They will not increase the salaries of any officer, director, or employee of the corporation;

(d) They will not employ any person to work in the office of the corporation or to have supervisory control over another employee;

(e) They will purchase no new machinery or equipment in excess of a value of One Thousand Dollars ($1,000);

(f) They will not sell or dispose of any of the equipment, motor vehicles or assets of the corporation;

(g) They will not do anything to deplete the assets, or impair the value of the capital stock of the corporation.

4. The Parties of the First Part and the Party of the Second Part agree that they will keep in the employ of the company at all times a man with supervisory authority who is satisfactory to the Party of the Third Part, with experience and knowledge of the business of manufacturing blocks.

5. The Parties of the First Part and the Party of the Second Part will pay the rent owing by the corporation promptly when due.

6. The Party of the Third Part shall have the power to vote all of the capital stock of the corporation held by him under this agreement, and to that extent the Parties of the First Part constitute and appoint the Party of the Third Part as their proxy to act for them in their stead.

The agreement was signed by the Bettises, petitioner, by its president, Lackey, and Lackey as trustee.

By a deed dated July 1, 1963, and notarized July 24, 1963, petitioner conveyed its land and buildings to Bettis and his wife. The land was a tract of approximately 7 acres. The buildings located on the land were a small office building, a garage, a block plant building, a ready-mix bin, and block plant bins. The consideration for the conveyance was $18,000 paid on July 26, 1963, from the $25,000 that Bettis had borrowed. The amount paid represented the book value of these assets.

By a lease dated July 1, 1963, and notarized July 24, 1963, petitioner leased from the Bettises the land and buildings which it had sold them on the same day. The term of the lease was 12 years beginning July 1, 1963, and continuing through August 31, 1975. In its pertinent parts, the lease specifically provided:

1. In consideration * * * [for the lease], the Lessee [petitioner] hereby covenants and agrees to pay the Lessors [the Bettises], without the necessity of any demand, as rent for said demised premises, the sum of One Thousand Three Hundred Twenty-five Dollars ($1,325.00) per month, payable in advance on the first day of each month during the term of this lease.

2. The Lessee shall carry fire insurance with extended coverage on the buildings located on the said premises with some reliable insurance company acceptable to the Lessors in the sum of not less than Five Thousand Dollars ($5,000.00) and shall carry the same coverage on the equipment located on the premises in the sum of not less than Ten Thousand Dollars ($10,000.00) with the Lessors being designated as beneficiary of said policies.

3. The Lessors, their heirs and assigns, shall have a lien on all the equipment, furniture, fixtures, and machinery located on the said premises to secure the payment of all rents that may become due under the terms of this lease.

4. The Lessee covenants and agrees that it will maintain said property and keep the same in good repair and will return the said premises upon the expiration of this lease in as good condition as when received, ordinary wear and tear excepted.

5. The Lessee shall pay the bills for any and all utilities used in said building and shall pay for heating the said building.

6. The Lessee is to make no changes of any nature in the above named premises without first obtaining the written consent from the Lessors and the Lessors, or their agents, shall have the right to enter the premises at reasonable hours to examine the same and make such repairs, additions, or alterations as may be deemed necessary.

7. The Lessee agrees that it will not assign this lease or sub-let said premises, or any part thereof, without the written consent of the Lessors.

8. The property herein leased shall be used by the Lessee as a block manufacturing and ready-mix cement plant, and the Lessee agrees that at no time during the term of this lease shall beer, whiskey, or other intoxicating beverages be sold or distributed on said premises.

The lease was signed by the Bettises and petitioner, by its president, Lackey.

By an assignment dated July 1, 1963, and notarized July 24, 1963, the Bettises made an assignment of certain rights in the lease of July 1, 1963. The assignment specifically provided in its pertinent parts:

For value received and as additional security for two (2) negotiable, promissory, installment notes hereinafter mentioned, the Parties of the First Part [the Bettises] hereby sell, transfer, and assign unto the Parties of the Second Part [the Lackeys], their heirs and assigns, all issues, profits, revenues, royalties, rights and benefits from the following described property located in the 7th Civil District of Jefferson County, Tennessee, including the following parcels:

Being all the property described in the deed from Jefferson Block & Supply

Company to the Parties of the First Part of even date herewith, a portion of which property is presently occupied by Jefferson Block & Supply Company * * *.

And to that end the Parties of the First Part hereby assign and set unto the said W. H. Lackey and wife, Willie D. Lackey, their heirs and assigns, all leases of said premises now made, executed or delivered, whether written or verbal or to be hereafter made, be the same written or verbal, including specifically, without limiting the generality thereof, the lease dated July 1, 1963, becoming effective immediately, with the rent falling payable at the rate of One Thousand Three Hundred Twenty-five Dollars ($1,325.00) per month.

It is understood and agreed that the Parties of the Second Part shall not exercise any of their rights under this assignment or [sic] rents unless and until there has been default in the payment of said indebtedness.

It is understood and agreed that the Parties of the First Part shall not have the right to collect any installment or installments of rent in advance of the date prescribed in said lease for the payment thereof.

And the Parties of the First Part do hereby authorize and empower the Parties of the Second Part, their heirs and assigns, to collect the said rents, issues, profits, revenues, royalties, rights and benefits as they become due and do hereby direct each and all of the tenants of the aforesaid premises to pay such rents as may now be due of [sic] shall hereafter become due to the Parties of the Second Part, their heirs and assigns, upon demand for payment thereof by said Parties of the Second Part, their heirs and assigns. It is understood and agreed, however, that until such demand is made the Parties of the First Part are authorized to collect or continue collecting said rents, issues, profits, revenues, royalties, rights, and benefits.

The term of this assignment shall be until two (2) notes dated July 1, 1963, made, executed, and delivered by the Parties of the First Part, to W. H. Lackey and wife, Willie D. Lackey in the amount of One Hundred Sixteen Thousand Seven Hundred Fifty Dollars ($116,750.00), and to Sue Bird in the amount of Twenty-six Thousand Two Hundred Fifty Dollars ($26,250.00), together with interest thereon, shall have been paid and fully satisfied.

This assignment is given as additional security for the performance of each, and all of the obligations of the notes, or any extension or renewal thereof, and the expenses of collection, if any, and the undersigned Parties of the First Part, assignors, expressly covenant and declare that at the time of the execution and delivery of this assignment there has been no anticipation or prepayment of any rents by the tenant occupying the above described property or by the Lessee in the above described lease.

It is further covenanted and agreed that the Parties of the First Part, assignors, and their heirs or assigns, shall have no power to or authority to alter, modify, or amend the terms, or any of them, of the above lease in any particular whatsoever without first obtaining the consent in writing of the Parties of the Second Part, to such alteration, modification, or amendment.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

It is understood and agreed that neither the existence of this assignment nor the exercise of its privilege to collect said rents, issues, profits, revenues, royalties, rights, and benefits hereunder, shall be construed as a waiver by the Parties of the Second Part, or their heirs and assigns, of the right to enforce payment of the debt hereinabove mentioned, in strict accordance with the terms and provisions of the notes for which this assignment is given as additional security.

The assignment was signed by the Bettises and petitioner, by its president, Lackey.

All agreements pertaining to the purchase of petitioner's stock were conceived and drafted by Lackey, his lawyer, and his accountant. The agreements were not explained to Bettis until after he had agreed to purchase petitioner's stock. Bettis was given no voice in the planning of the purchase agreements. He could not have purchased the stock of petitioner if he had been unwilling to structure the transaction in the manner presented by Lackey and his attorneys.

Although Lackey explored other avenues of disposing of petitioner, such as selling his stock to a competitor of petitioner or liquidating petitioner, he felt that the arrangement with Bettis would bring him the greatest as well as the safest return.

During the years in question, petitioner paid the real property taxes on the land it leased from the Bettises. Petitioner paid insurance premiums on the property as provided in the lease of July 1, 1963.

For its fiscal years 1964 through 1969, petitioner deducted on its income tax returns the following amounts of compensation and rents paid to Bettis:

| Fiscal year | Compensation | Rents |
|---|---|---|
| 1964 | $12,000 | $10,600.62 |
| 1965 | 12,000 | 15,900.00 |
| 1966 | 12,000 | 15,900.00 |
| 1967 | 12,000 | 15,900.00 |
| 1968 | 13,200 | 15,900.00 |
| 1969 | 11,200 | 20,175.00 |

The rents were paid pursuant to the above-mentioned lease. Lackey did not know of the 1969 increase in rents.

Prior to the sale of petitioner's stock, Lackey sold a block plant in Kingsport, Tenn. Because Lackey did not put a limitation on salaries in the sale agreement, the purchaser tripled his salary and as a result placed the business in financial trouble. Lackey placed the limitation on Bettis' salary and obtained an assignment of rents to prevent a similar situation from occurring from the sale of petitioner's stock.

The $12,000 salary paid to Bettis in each of fiscal years 1964 through 1967 was agreed upon by Lackey and Bettis at the time of the sale. Because of the 10-percent surtax in effect in 1968, Bettis found that he would need a greater salary in that year. Therefore, the salary was raised in 1968 with Lackey's permission to $13,200. However, for 1969 Bettis' salary was lowered to $11,200.

For his taxable years 1968 through 1969, Bettis reported all the rental payments received from petitioner pursuant to the lease on his individual income tax return as rental income.

In his notice of deficiency respondent made the following disallowances of deductions for the rentals and other payments made with respect to the real estate leased from the Bettises:

|  | 1967 | 1968 | 1969 |
|---|---|---|---|
| Claimed: | | | |
| Cash rent paid | $15,900.00 | $15,900 | $20,175.00 |
| Property taxes paid | 266.64 | | 613.59 |
| Insurance paid | 1,000.00 | 1,000 | 1,000.00 |
| Total amount claimed | 17,166.64 | 16,900 | 21,788.59 |
| Allowed | 3,000.00 | 3,000 | 3,000.00 |
| Disallowed | 14,166.64 | 13,900 | 18,788.59 |

The ground for the disallowances was that petitioner had not established that the rental payments disallowed were required to be made as a condition to the continued use or possession of the property.

OPINION

On July 1, 1963, Lackey and members of his family sold all of the stock of petitioner to Bettis for $150,000 of which only $7,000 was paid in cash. Bettis gave the Lackeys 12-year promissory notes totaling $143,000 as the balance of the consideration. On the same day petitioner sold to Bettis land and buildings used by it in its business for $18,000 and leased this same property back for a 12-year term at a monthly rental of $1,325 per month. Petitioner also agreed to pay all bills necessary to insure, maintain, or use the property. Also on July 1, 1963, Bettis assigned the lease with petitioner to Lackey as security for payment of the promissory notes. All of these transactions were conceived and executed by Lackey and his attorneys for the purpose of guaranteeing that the purchase price of the stock was paid by Bettis. Bettis did not participate in the planning of the transactions and merely lent his signature to whatever documents Lackey placed before him. For the fiscal years 1967 through 1969 respondent disallowed deductions for rent, taxes, and insurance with respect to the property leased from Bettis to the extent that they exceeded $3,000 in each year.

Petitioner claims that the full deductions taken with respect to the property leased from Bettis are permitted under section 162(a)(3) which provides the following:

(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

* * * * * * *

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

In the alternative, petitioner argues that the deductions are allowable as compensation payments to Bettis who was petitioner's president during the years before us. We do not believe that the deductions are properly allowable under either theory.

The total of rent and other expenses paid by petitioner for the use of the property leased from Bettis equaled in each year from 94 to 120 percent of the amount that Bettis paid to purchase the land. Faced with defending such a patently fantastic return on Bettis' investment, petitioner contends without support in the record that the land was worth a great deal more than $18,000, a contention which undermines his primary argument that we should permit the deductions because the payments were made under contracts negotiated at arm's length. We have found no support for this latter contention in *Alden B. Oakes*, 44 T.C. 524 (1965), and *Skemp* v. *Commissioner*, 168 F. 2d 598 (C.A. 7, 1948), which are relied upon by petitioner, because in both of these cases the amounts of rental paid under circumstances somewhat similar to those present here were found to be reasonable.

Although the agreements between Lackey and Bettis may have been the result of arm's-length bargaining, petitioner in no way dealt at arm's length with Bettis in arriving at the terms of the lease. In fact, the interests of petitioner were not considered at all in the terms of the lease. Lackey engineered the sale and leaseback arrangement between petitioner and Bettis solely to benefit himself in his role as a creditor of Bettis. Lackey, as president of petitioner, abandoned his obligation to enter into a fair lease agreement with Bettis because whatever detriment petitioner suffered as a result of the lease accrued to him as a benefit in his capacity as a creditor of Bettis. Where a lease is executed in the absence of arm's-length dealing, respondent may disallow that portion of the amounts paid under lease which exceed what would have been paid if the parties had dealt at arm's length. *Southeastern Canteen Co.* v. *Commissioner*, 410 F. 2d 615 (C.A. 6, 1969) ; *J. J. Kirk, Inc.*, 34 T.C. 130 (1960), affd. 289 F. 2d 935 (C.A. 6, 1961).

Respondent allowed petitioner rental deductions of $3,000 in each year for the land leased from Bettis. This amount represents a yearly return on Bettis' investment of nearly 17 percent. Taking the record as a whole into consideration, we believe that respondent's determination represents a fair rental, and we are not inclined to allow petitioner any greater deductions.

Petitioner presented a great deal of evidence tending to show that Bettis' services as president and general manager of petitioner during the years in issue were worth a great deal more than the salary paid to him. Be that as it may, we cannot allow petitioner to deduct as compensation to Bettis the disallowed rental payments. The agreements of

the parties, the income tax returns of Bettis and petitioner, and all other evidence in the record indicate that the payments under the lease were not intended to be compensation for the services of Bettis but were supposed to be compensation for the use of property. We have consistently held that deductions under section 162(a)(1) for compensation for services are allowable only for amounts actually paid for services and not for amounts paid for other reasons. *Paula Construction Co.*, 58 T.C. 1055 (1972), on appeal (C.A. 5, Nov. 13, 1972); *J. J. Kirk, Inc., supra.*

*Decision will be entered for the respondent.*