MILTON LEWIS AND LOLLIE B. LEWIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lewis v. Commissioner
Docket Nos. 5348-70, 5349-70, 5350-70
United States Tax Court
T.C. Memo 1974-59; 1974 Tax Ct. Memo LEXIS 258; 33 T.C.M. (CCH) 283; T.C.M. (RIA) 74059; March 11, 1974, Filed. *258 Pursuant to an agreement with his corporate employer petitioner was reimbursed for 60 percent of his expenses for depreciation and maintenance of his personal residence by reason of his entertainment of clients of his employer. Petitioner was an officer but not a shareholder, and the agreement was reached in an arm's-length negotiation. Fact of some entertainment stipulated. Petitioner filed an accounting annually with his employer. Held: Since petitioner adequately accounted to his employer he is entitled to deduct his expenses under sec. 162 and sec. 274(d) is inapplicable. A. Calder Mackay, Adam Y. Bennion, and Victor L. Walch, for the petitioners. Sheldon M. Sisson, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes as follows: Docket No.
Year
Amount 5348-70
1963
$ 7,803.05
1964
8,970.97
1965
9,220.46
1967
14,007.42
5349-70
1966
5,865.60
5350-70
1966
5,865.60
The issue we must decide is whether petitioner, Milton Lewis, is entitled to deduct under the provisions of section 162(a), Internal Revenue Code of 1954, [1] the cost of maintaining his personal residence for business entertainment and for which his employer granted reimbursement. *260 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. The petitioners, Milton Lewis and Lollie B. Lewis, are husband and wife and resided at the time of the filing of their petitions herein at Beverly Hills, California. Petitioners filed their Federal income tax returns [2] for the years in issue with the district director of internal revenue at Los Angeles, California. We will hereinafter refer to Milton Lewis as petitioner. During the years 1928 to 1949 the petitioner was primarily engaged in negotiating with oil and mineral companies for the sale of refineries and related equipment, cooling towers, sulphur plants and chemical plants. In 1949 petitioner joined the Ralph M. Parsons Company (hereinafter the "Company") as executive vice-president. He became president of the Company in 1965 and continues in that capacity to the present. His primary responsibilities in both offices have been sales and negotiations. The stock *261 of the Ralph M. Parsons Company was owned solely by Ralph M. Parsons (hereinafter Parsons), presently chairman of the board, until a public offering was made on July 23, 1969. Throughout the years in issue, the petitioners did not own any stock or options to purchase stock in the Company. The Company's activities include a variety of large and complex projects throughout the world, ranging from the design and construction of oil refineries for private industry to the design and engineering of support facilities for the ballistic missile and space programs of the United States Government. In general, the Company provides four broad categories of services: (1) petroleum and chemical engineering and construction; (2) metallurgical and mining engineering and construction; (3) general engineering and construction; and (4) systems engineering. The Company is basically a professional service organization offering to its customers engineering and technical services performed by its own professional personnel. The engineering on the projects undertaken by the Company is handled by its own professional staff. In construction the Company furnishes management, procurement, and supervisory *262 services from its own staff, but job-site labor and most construction equipment are hired by the Company either directly or through subcontractors on a project basis. Normally the entire cost to the Company of such construction equipment and labor, as well as of the materials employed in construction, is reflected in the Company's gross revenues. The Company believes that its earnings are mainly attributable to the services rendered by its own professional employees and that a relatively minor portion of its earnings is attributable to revenues from materials, equipment and labor employed in construction work. Consequently, the Company believes that the contribution which any project may make to the Company's earnings will generally depend upon the extent to which the gross revenues from such projects are attributable to services rendered by its own regular professional personnel. When the petitioner entered the employ of the Company in 1949, it was not a major competitor in its industry. The Company has since experienced substantial growth, with gross revenues increasing from $3,499,000 in 1950 to $230,159,000 in 1966. Total personnel has increased from slightly under 500 *263 employees in 1949 to in excess of 15,000 in 1967. As of 1969 the Company, which has its principal office in Los Angeles, California, had six subsidiaries operating out of London, England; Liege, Belgium; Bombay, India; New York, New York; Paris, France; and Frankfurt, West Germany. The Company has a number of competitors which offer similar technical services. Parsons, the founder of the Company, and petitioner determined that in order to maximize its profits, the Company would be selective in developing clients and try to limit its work, if possible, to negotiated rather than bid contracts. As a result of this philosophy, petitioner and other officers of the Company spent years cultivating the friendships of key executives in selected firms throughout the world. It is the Company's belief that, with this treatment, clients tend to feel that the Company has a personal interest in their needs and are thus more likely to negotiate a contract. One of the necessary elements in developing a strong personal relationship with clients was entertaining in a personal residence. Moreover since a great number of the clients were European, it was considered more desirable to entertain them *264 in a home, as is their custom, rather than in a restaurant or club. The Company also purchased a $750,000 yacht for entertaining clients but does not own any other entertainment facility. Petitioner has made his residence available for entertaining Company clients since his employment. From 1949 through 1955, the petitioner deducted 100 percent of the costs of maintaining his home including depreciation. During an audit of petitioner's 1955 tax return, it was administratively determined by internal revenue service personnel that 60 percent of his expenses could be deducted. After this determination, petitioner began receiving a reimbursement from the Company for 60 percent of his home maintenance costs. In 1963 petitioner moved from a house to a large penthouse in Los Angeles. During one large meeting the penthouse became quite crowded. Parsons, who was displeased with the situation, suggested that the petitioner purchase a house since an apartment was not befitting a person of petitioner's circumstances. Parsons himself did not wish to use his own home for Company entertainment purposes. The Company thereupon provided petitioner with a $300,000 loan to enable him to *265 build a house. Parsons helped pick out a lot on which to build the house, and took a personal interest in its construction. Petitioner was also to receive his 60 percent reimbursement to cover all maintenance expenses. In a letter dated August 7, 1967, Parsons, speaking on behalf of the Company, stated the agreement, in part, reached with the petitioner: Dear Milton and Lollie: The purpose of this letter is to set forth our mutual understandings as to the repayment of funds advanced by the Company to you to enable you to buy your home at 390 Trousdale Place, Trousdale Estates, Beverly Hills, California, and the Company's assistance to you in such repayment program. In this connection, the Company recognizes you use your home extensively for Company entertainment purposes as required of you in your position as President. As you know, the Company heretofore borrowed $300,000 from the Bank of America which was loaned to you by the Company, the latter loan represented by a note dated March 1, 1967. Such note is payable in ten equal annual installments of $30,000.00 each, together with interest on the unpaid portion at the rate of seven percent per annum, payable quarterly. *266 This note is secured by a trust deed which constitutes a first lien on the subject property. On March 11, 1967 the Company assigned such note and trust deed to the Bank of America. For this reason you make your payments on such note directly to the Bank. In further consideration of your present employment as President of the Company, the Company hereby grants, to the executor or administrator of your estate, in the event you are an employee of the Company at the time of your death, an option to sell such property hereinafter described to the Company at a purchase price to be determined within thirty days from date hereof, such purchase price to represent cost to you as evidenced by mutually agreed to inventory of your disbursements. * * * * * * The aforesaid property is described as comprising the lot, house, air conditioning equipment, kitchen and laundry equipment including stoves, refrigerators, deep freeze, dishwasher, clothes washer, clothes dryer, and other similar items, together with all permanent installations and fixtures including chandeliers, sconces, television, hi-fi and intercom systems. Said property does not include carpeting, rugs, draperies, furniture, *267 accessories, and other personal effects. It is agreed that you will pay all taxes when due, that you will maintain the house and grounds in first-class condition, and do whatever is necessary to assure that the property is clear of all obligations other than the aforesaid deed of trust when and if the option to sell such property to the Company is exercised. Although, in line with Company policy and your own desires, the agreements herein do not constitute an employment agreement, in order to assist you in meeting the obligations specified above, the Company has agreed to increase your annual compensation to $100,000.00, commencing January 1, 1967, payable in accordance with the Company's usual payroll practices. Further, a bonus will be paid to you in the amount of $40,000.00 for the year 1967, payable within thirty days after the end of such year. Your annual compensation and bonus will be continued at such rates for an indefinite period of time, until other action is taken by the Board of Directors of the Company. * * * If this letter fully sets forth your understanding as to these matters, please so signify by signing below. Sincerely yours, THE RALPH M. PARSONS *268 COMPANY (Signed) Ralph M. Parsons By Ralph M. Parsons Chairman of the Board (Signed ) Milton Lewis Milton Lewis As of December 31, 1967 the cost of constructing the house was $364,772.71. The investment in furniture and fixtures amounted to $175,659.82 and the land cost $115,000. The total investment in the house was $655,432.53. The house has 6,383 square feet of living area. The formal dining room can seat 12 people. However the house has a patio where as many as 100 people can, and have been, seated for dinner. The Company conducted a study to determine the design best able to allow people to flow through the house normally. The house also contains many complex systems, such as lighting and air conditioning, which necessitated the preparation of an elaborate 85-page operations manual. The Company kept maps of how to get to the residence for the use of customers. There is no regular household staff, rather the petitioner secures temporary assistance prior to entertaining. Petitioner would not have bought a home as large and expensive were it not for his corporate obligations and the assistance from the Company. Petitioner received the following annual salaries *269 and bonuses from the Company during the years in issue: Year
Annual Compensation 1963
$ 53,751.36
1964
61,443.04
1965
70,096.56
1966
80,000.96
1967
139,230.96
The residence serves the dual purpose of accommodating the petitioners as their personal home and serving as an entertainment facility for Company entertaining. Petitioner and his secretary each maintained a current calendar for the years 1963 through 1967. These calendars recorded the dates petitioner was out-of-town on business as well as the dates when he entertained in his home. In addition, the calendars indicated either the companies whose employees were being entertained or the names of those persons themselves who were being entertained. These calendars were not complete. According to these calendars petitioner was away from home on business as follows: Year
Days 1963
107
1964
114
1965
97
1966
91
1967
99
During the years in issue, 231 individuals were entertained 962 different (though often simultaneously) times for business purposes. Eight-six (86) persons were entertained 72 different times for nonbusiness reasons. On any particular occasion petitioner *270 would entertain both business and personal friends.The actual number of occasions when one or more persons were entertained at dinner at petitioners' house were as follows: Year
Number of Occasions 1963
27
1964
34
1965
24
1966
34
1967
35
Company entertaining at petitioner's home consisted of having cocktails and dinner. At that time business is often the topic of conversation. If dinner is not served at home, guests are frequently taken out to dinner. Petitioner occasionally made his guestroom available to out-of-town guests. The house was also the site of two annual Company parties given for the executives and the chief engineers, where well over 100 guests attend. The house has also been the scene of several birthday parties given in honor of the petitioner which are attended by Company officers and their wives. The house was available to other Company executives for entertaining business clients. Fourteen of the Company's officers are known to have used petitioner's home in such a capacity. Use by other officers was never refused. By letter dated August 27, 1967 to the American Stock Exchange, in response to an inquiry, from Harry J. Burton *271 (hereinafter Burton), the executive vice-president and treasurer of the Company, the following was stated with respect to the use of petitioner's residence by the Company: * * * The problem for the Company is how to open the doors. One of the techniques used is the case in point, namely, the extensive use of a fine personal residence for meeting with the customers' senior people. The importance of being able to open doors to top executives is directly related to the construction and engineering business done by the Company. Any engineering company with sufficient financial resources can bid anywhere in the world on projects open to it. It is another matter, however, to bring a proposal for a newly conceived construction and engineering project to the attention of the Board of Directors of one of the large international corporations, or to the attention of a foreign government, and to sell them on such a project. As mentioned above, the responsibility for business development rests on the shoulders of the top management of the Company.It is these individuals who must actively check new jobs out and develop the work, not sit back passively and accept orders or even bid on jobs *272 developed by prospective customers. Parsons is not selling a unique product. It is selling a service. The Company offers the ability and imagination of its personnel and must constantly convince customers and prospective customers that these personnel are of the highest caliber. Mr. Lewis has used his home in promoting the business of the Company by bringing Parsons to the attention of top echelon business executives and establishing and maintaining these executives as business friends. In summary, since the nature of this Company's business is such that securing a major contract depends significantly on the personal relationship of the senior officers, particularly Mr. Lewis, with customers' key personnel, the development of this relationship has been pursued carefully by Mr. Lewis and the other senior officers and it has been found extremely beneficial to the best interests of the Company for Mr. Lewis to have a home in which he can develop these relationships with reasonable reimbursement to him therefor. Each year petitioner receives from his accountant a report of what expenditures, based on records, checks and bank statements, should be included on his expense statement *273 to the Company. Petitioner turns this report over to his secretary who prepares the expense statement to be submitted to Burton. The statement itself lists a dollar amount under miscellaneous expenses. Under remarks the statement states "depreciated allowance for entertainment and other business requirements for use of home." Burton reviews the statement to ascertain whether it has been prepared within the framework of the reimbursement agreement. He compares the statement to the report to petitioner from his accountant and then discusses the amount of the reimbursement with Parsons, and secures his approval. During the years in issue, petitioner deducted on his Federal income tax returns the following amounts, which represent 60 percent of the depreciation on his home and furniture, rent, utilities, general maintenance, and servants, which expenses were disallowed by respondent: Year
Amount 1963
$ 11,534.62
1964
13,105.46
1965
13,557.20
1966
15,288.75
1967
22,118.75
Respondent did not contest the deductibility of expenses incurred directly for entertaining such as food, liquor, catering, etc., which were also reimbursed by the Company. OPINION
*274 Petitioner received a reimbursement from his employer, the Company, for 60 percent of the costs incurred in maintaining his personal residence which was made available and used for business entertaining. The sole issue for our decision is whether petitioner is entitled to deduct under the provisions of section 162(a) the amount of the home maintenance costs for which the reimbursements were given. Petitioner deducted the 60 percent of his home maintenance costs, including depreciation, on the basis that his home was made available for business entertaining of the Company's clients. Further, at least with respect to 1967, petitioner purchased a larger home than he required because of his corporate obligations. In fact his home was used on many occasions for entertaining business clients of the Company. The respondent argues that the actual business use of the home was quite limited and as a result petitioner is entitled to deduct a very small amount of his maintenance expenses based on actual business use. For purposes of section 162, where an employee accounts to his employer and the business expenses equal the amount of the reimbursement, the taxpayer need not report the *275 reimbursement in income. Section 1.162-17(b) (1), Income Tax Regs. To "account" means the submission of an expense account to the employer "showing the business nature and the amount of all the employee's expenses." Section 1.162-17(b) (4). [3] *276 The reimbursement figure has been in effect since 1955. [5] The degree of use was not entirely at the option of the petitioner. We say "not entirely" because obviously petitioner, as he succeeded to increasing roles of importance in the Company hierarchy, frequently made the decision on behalf of the Company when his house was to be used for business purposes. Nevertheless other Company officials were entitled to entertain there under the reimbursement understanding. No one was ever refused that privilege. Petitioner carried out his end of the bargain by holding his home available to the Company for its use at its pleasure. It is our view that, if respondent feels that the actual use of the residence did not justify the dollar amount of reimbursement, he has picked the wrong target. Cf. Jefferson Block & Supply Co., 59 T.C. 625 (1973), on appeal (C.A. 6, May 7, 1973). We hold that petitioner, having adequately accounted to his employer, is relieved by the regulation promulgated *277 with respect to section 274(d) from making a comparable section 274(d) substantiation to the respondent. It follows that it is our conclusion that, under the essentially atypical facts of this case, petitioner is entitled to deduct against the reimbursement the expenses in issue relating to the maintenance of his residence. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩
2. Petitioners filed joint Federal income tax returns for the years 1963, 1964, 1965 and 1967. They filed separately for 1966. ↩
3. Sec. 1.162-17(b) (4). To "account" to his employer as used in this section means to submit an expense account or other required written statement to the employer showing the business nature and the amount of all the employee's expenses * * * broken down into such broad categories as transportation, meals and lodging while away from home overnight, entertainment expenses, and other business expenses. * * * Section 274 provides for the disallowance of "Certain Entertainment, Etc., Expenses" of a rather specified nature and under rather specified circumstances. Subsection (e) (4) of section 274 excludes from the general definitional provisions of subsection (a) expenses incurred by a taxpayer with respect to certain activities and facilities, where said expenses are incurred under a "reimbursement arrangement" with a person for whom services are performed. Both parties agree that the reimbursement arrangement here involved makes section 274(a) inapplicable to the facts of this case. Instead they focus their disagreement (largely) on the applicability of the substantiation requirements of subsection (d) of section 274. The respective positions of the parties are predictable. Subsection (d) provides in pertinent part: (d) Substantiation Required. - No deduction shall be allowed - (1) under section 162 * * * (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, * * * * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the * * * entertainment, amusement, recreation, or use of the facility, * * * (C) the business purpose of the expense or other item and, (D) the business relationship to the taxpayer of persons entertained, using the facility, * * *. The amplifying regulation on the above subsection is denominated section 1.274-5 and is entitled "Substantiation requirements." Subparagraph (e) (5) of this regulation reads as follows: (5) Substantiation of expenditures by certain employees. An employee who makes an adequate accounting to his employer within the meaning of this paragraph will not again be required to substantiate such expense account information except in the following cases: * * * (iii) Employees in cases where it is determined that the accounting procedures used by the employer for the reporting and substantiation of expenses by such employees are not adequate, or where it cannot be determined that such procedures are adequate. * * * Section 1.274-5(e) (4) defines the term "adequate accounting to his employer" as follows: (4) Definition of an "adequate accounting" to the employer. For purposes of this paragraph an adequate accounting means the submission to the employer of an account book, diary, statement of expense, or similar record maintained by the employee in which the information as to each element of an expenditure (described in paragraph (b) of this section) is recorded at or near the time of the expenditure, together with supporting documentary evidence, in a manner which conforms to all the "adequate records" requirements of paragraph (c) (2) of this section. * * * Paragraph (b) of the regulations cited in the above quotation refers us to the substantiation requirements of section 274(d) and states the pertinent elements of an expenditure as follows: (b) Elements of an expenditure - (1) In general. Section 274(d) and this section contemplate that no deduction shall be allowed for any expenditure for * * * entertainment * * * unless the taxpayer substantiates the following elements for each such expenditure: (i) Amount; (ii) Time and place of * * * entertainment (or use of a facility with respect to entertainment), * * * (iii) Business purpose; and (iv) Business relationship to the taxpayer of each person entertained, using an entertainment facility * * *. While petitioner's method of accounting is not likely to be cited as a classic, we hold it is in substantial compliance with the statute and the underlying regulations. Cf. LaForge v. Commissioner, 434 F.2d 370 (C.A. 2, 1970), reversing 53 T.C. 41 (1969). The parties have stipulated the amount of the expenses. Records of the time and place of entertainment were contemporaneously kept and were also testified to. The same statement may be made both with respect to the business purpose and business relationship to the Company. Exhibits were introduced at the trial showing the contracts that had been entered into with companies employing those entertained. Respondent concedes that petitioner was expected to entertain Company guests in his home and that he did in fact so entertain. However, respondent has labeled such use minimal. We think respondent has a point in calling the business use minimal compared to the 60 percent reimbursement formula. It may well be that the Company made a bad bargain. But cf. Income Tax Regs., section 1.162-7(b) (2). [4]↩ This possibility caused us to take a second look at the arrangement. However, there is nothing to indicate that it was not initiated and made in an arm's-length negotiation. The petitioner was not a shareholder (at least during the years in issue). The Company's chief executive officer and sole (then) shareholder suggested that petitioner, rather than he, do the home entertaining. He took an active interest in the selection of the location and building of the 1967 house. The benefit to petitioner's employer arising from the entertainment in question has been demonstrated. The arrangement was made prior to the enactment of section 274(d) and hence could not have been conceived as a means of avoiding the effect of that subsection. 5. Respondent may be second-guessing himself on the figure. See Kenneth A. Scott, T.C. Memo. 1972-109↩.