**SPARKS NUGGET, INC., et al.,**
**Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.**

**No. 26504.**

United States Court of Appeals,
Ninth Circuit.

April 6, 1972.

**632**

Valentine Brookes (argued), Derek T. Knudsen, Richard A. Wilson, of Brookes, Maier & Wilson, San Francisco, Cal., for petitioners-appellants.

Richard Farber (argued), Bennet N. Hollander, Meyer Rothwacks, Johnnie M. Walters, Asst. Atty. Gen., Washington, D. C., for respondent-appellee.

Before ELY and CHOY, Circuit Judges, and BYRNE,* District Judge.

WILLIAM M. BYRNE, District Judge:

Appellants Sparks Nugget, Inc. (Sparks Nugget), and R. L. and Flora Graves (sometimes referred to as the Graves), taxpayers whose petitions for redetermination of the Commissioner's assessments of additional taxes were consolidated for trial, have appealed to this court to reverse the Tax Court's decision sustaining the said assessments. Jurisdiction to rule on the merits of this appeal has been conferred under Section 7482 of the Internal Revenue Code of 1954.

---

* Honorable William M. Byrne, United States Senior District Judge, Central District of California, sitting by designation.

During 1958 and 1959, R. L. Graves acquired six and one-half lots located in Sparks, Nevada, at a cost of $253,609.04. On June 3, 1959, he transferred title to the lots to Sparks Development Company (Sparks Development), a Nevada corporation wholly owned by the Graves, for cash, an assumption of liabilities and a note, totaling $253,253.05, and for additional Sparks Development common stock with a par value of $20,000. Upon acquiring title to the lots, Sparks Development borrowed $150,000 from the Nevada Bank of Commerce, of which $115,000 was secured by a first deed of trust on several of the lots.

In June of 1959, Sparks Development leased the six and one-half lots to Challenger, Inc. (Challenger), a Nevada corporation wholly owned by the Graves, for a term of five years at a monthly rental of $9,400 the first year and $8,000 the next four years. These lots were used by Challenger as parking lots in connection with its operation of a gambling casino known as the Sparks Nugget Casino (the casino). The financial success enjoyed by the casino was attributable, in part, to its ability to make available, by way of the leased lots, ample free parking to its customers.

The lease agreement negotiated by R. L. Graves on behalf of both Challenger and Sparks Development determined the rental on the basis of the amount of income that Sparks Development would need to pay R. L.'s compensation, its income tax and its purchase obligation on the parking lots. Pursuant to the terms of the lease, Challenger was required to keep the premises in good repair, to maintain liability insurance and to pay the utilities as well as the real property taxes. Additionally, Challenger bore the cost of improvements, including the cost of resurfacing.

Sparks Nugget is a Nevada corporation which was incorporated on September 29, 1960. From the time of its incorporation until June 26, 1961, all of Sparks Nugget's outstanding stock was owned by John and Rose Ascuaga. On that day, the Graves secured ownership of 1.2 percent of the outstanding stock.

The day following its incorporation, September 30, 1960, Sparks Nugget purchased all of the outstanding stock of Challenger from the Graves. Thereafter, on June 30, 1961, Challenger was dissolved and all of its assets were distributed in complete liquidation to Sparks Nugget. Prior to trial, Sparks Nugget acknowledged that as transferee of Challenger's assets, it was liable for any deficiencies determined in the income taxes of Challenger for taxable years 1959 and 1960.

During the taxable years 1959 and 1960, Challenger's parking lot rental expenditures totaled $37,000 and $107,200, respectively. Acting under Section 162 [1] of the 1954 Code, the Commissioner disallowed rental deductions claimed by Challenger with respect to the parking lots to the extent the monthly payments exceeded $4,000 on the ground that such excess amounts were not ordinary and necessary business expenses required to be made for the use of the lots. The Tax Court sustained this disallowance, finding that "The reasonable rental of the parking lots during 1959 and 1960 did not exceed $4,000 per month." Those portions of the payments which were in excess of this "reasonable rental" value were deemed constructive dividends to the Graves.

The taxpayers have challenged the Tax Court's invocation of Section 162.

---

[1]. Section 162 of the 1954 Code provides in pertinent part as follows:

"(a) In general.—There shall be allowed all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(3) rentals or other payments required to be made as a condition to the continued use or possession of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

In their view, the disallowance of excessive rentals paid between related parties is the exclusive domain of Section 482.[2] If that were not so, maintain the taxpayers, that section's provisions, as well as its explicating regulations, would be more redundancies, in that the general provisions of Section 162 would also be controlling of related, controlled or affiliated businesses. The significance of this section's applicability to the instant controversy is, according to the taxpayers, that the Commissioner would be precluded from effecting any taxable increase to the income of the Graves.

The asserted pre-eminence of Section 482 in determining the tax consequences of rental agreements among so-called related parties is said to be underscored by the holding of Rubin v. C. I. R., 429 F.2d 650 (2d Cir. 1970). There, fees were paid to a corporation for managerial service rendered by its controlling shareholder to a second corporation controlled by the same shareholder. Pursuant to Section 61, the Tax Court ruled that the money paid the taxpayer's corporation, in fact, constituted income of the taxpayer because he was the "true earner" of the money and that "in substance" he was directly in the employ of the second corporation. The Court of Appeals deemed the Tax Court's "approach" to be in error, holding that "resort to 'common-law' doctrines of taxation and the broad sweep of § 61" was unnecessary because there was "a statutory provision adequate to deal with the problem presented." The court remanded the case to the Tax Court for consideration of the substantive and procedural questions surrounding the "Commissioner's claim under § 482." On remand (56 T.C. 1155) the Tax Court, noting

that the Second Circuit had not "disturb[ed]" its findings, determined that under these "particular" facts, allocation of income pursuant to Section 482 was appropriate.

■ Although the somewhat distinctive factual setting of Rubin, no doubt, was the principal factor responsible for the Second Circuit's analysis, the present mundane controversy does not require that we too add a new wrinkle to the law. As we view the issue, this case is yet another example of evaluating a rental agreement negotiated by closely related parties. The standards for such an evaluation have been well established by the courts. In essence, it has been consistently held that payments in excess of reasonable rent made pursuant to an agreement between closely related parties which was not the product of arm's length negotiation are not deemed "required" and thus are not deductible under Section 162(a) (3). Southeastern Canteen Co. v. C. I. R., 410 F.2d 615 (6th Cir. 1969), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969); Potter Electric Signal and Manufacturing Co. v. C. I. R., 286 F.2d 200 (8th Cir. 1961); Midland Ford Tractor Co. v. C. I. R., 277 F.2d 111 (8th Cir. 1960), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 102 (1960); Utter-McKinley Mortuaries v. C. I. R., 225 F.2d 870 (9th Cir. 1955). See, Van Keppel Co. v. United States, 321 F.Supp. 1183 (W.D.Mo.1971).

A recent example of the thinking which has long prevailed is Southeastern Canteen Co. v. C. I. R., supra. There the Sixth Circuit upheld the Tax Court's disallowance of part of the taxpayer's deduction for rental payment paid pursuant to the sale-leaseback agreement

2. Section 482 of the 1954 Code provides as follows:
"Allocation of income and deductions among taxpayers.
"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses."

negotiated between corporations controlled by the same individuals. In so ruling, the court relied upon the following general rules:

"The fact that the parties designated, and one party became obligated to pay to the other, a specified amount as rent does not bind the government to treat that amount as rent. (Citations omitted). Where there is an absence of arm's length dealing, the Commissioner may inquire into what constitutes reasonable rental to determine whether the amount paid exceeds what would have been paid had the parties dealt at arm's length." 410 F.2d at 619.

Applying these rules, the Court adopted the following analysis of the Tax Court as its own:

"Petitioners' position is further weakened by the fact that during the entire negotiations leading up to the execution of the sale-leaseback agreements, the owner of both the lessor (Gladco) and the lessees (petitioners) was the same person, Virgil Gladieux. Petitioners' attempt to transform such an identity of interest into a relationship which petitioners characterize as adverse, transgresses reasonable imagination. All the more so since the facts show that the sale-leaseback agreements were not intended to be ends in themselves but merely steps in an integrated plan to secure to Virgil and ABC advantages which could not benefit petitioners in any meaningful way. From a review of all the facts bearing on this issue, which have been set out at length in our findings, we are convinced that the sale-leaseback agreements in question were not the result of arm's length negotiation between adverse parties and, therefore, we must determine whether the purported rentals were 'in excess of what the lessee[s] would have been required to pay had . . . [they] dealt at arm's length with a stranger.' Roland P. Place, *supra*." 410 F.2d at 620.

■ A was true in *Southeastern Canteen,* we are also persuaded by the Tax Court's application of the established principles to the facts of the instant case. Specifically, we are in full accord with that court's conclusion "that the Parking Lot Lease was negotiated between closely related parties not dealing at arm's length." The bases of our accordance is the Tax Court's three-step analysis, summarized as follows: (1) The Graves were the sole shareholders of Challenger and Sparks Development; (2) R. L. Graves being the principal executive officer of both corporations, in effect, "negotiated" the lease agreement in his own mind; (3) the rent "agreed upon" did not reflect the actual value of the lease but served to aid Sparks Development in paying R. L. Graves' salary and in meeting its purchase obligation on the parking lots. See, Potter Electric Signal and Manufacturing Co. v. C. I. R., supra; Midland Ford Tractor Co. v. C. I. R., supra.

■■ In the absence of arm's length negotiations "an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger." Place v. C. I. R., 17 T.C. 199, 203 (1951), aff'd., 199 F.2d 373 (6th Cir. 1952), cert. denied, 344 U.S. 927, 73 S.Ct. 496, 97 L. Ed. 714 (1953). Here, the Tax Court weighed the evidence relating to the determination of the amount constituting monthly rent and concluded that it was an unreasonable sum of money. In the Tax Court's view, the value of the parking lots did not exceed $4,000 per month for the years 1959 and 1960. Unlike the taxpayers, we find this view to be embedded in a sound evidentiary foundation.

Arthur Reber, a professional appraiser who "has appraised numerous properties in the State of Nevada, including at least one gambling establishment . . (as well as) numerous commercial properties including parking lots," prepared

an appraisal of the fair rental value of the parking lots which the Tax Court believed adequately reflected the parking lots' value to Challenger because it was based on the prior prices paid "in the market place for properties used in connection with the casino's operations." Reber determined that the annual fair rental value of the parking lots was $36,681, an amount considerably less than the $48,000 allowed by the Commissioner and approved by the Tax Court.

In addition to Reber's appraisal, the Tax Court's decision is supported by the fact that the lease agreement between Challenger and Sparks Development was not meant to reflect the true rental value of the parking lots. As already noted, the rent was determined on the income needs of lessor Sparks Development. Thus, the "negotiating" parties agreed to a fundamental term of the lease agreement absent any consideration of the reasonable rental value.

It is also noteworthy that during the first year of the lease, Challenger's rental payments amounted to a 45 percent annual rate of return on the original cost of the lots (as already indicated, R. L. Graves purchased the lots for a total of $253,609.04). For the next four years of the lease, the rental payments yielded an annual rate of return of 38 percent. The higher rental payments imposed on Challenger for the first year reflected the higher loan payments required of Sparks Development in that year.

The taxpayers maintain that the Tax Court's assessment of the parking lots' rental value was in error because it failed "to consider all the evidence." Specifically, they maintain that Reber's appraisal cannot be viewed as reliable because it did not take into account the 34 percent return earned by the Challenger on the casino and related operations. Implicit in this challenge of the appraisal's reliability is the suggestion that the said rate of return should be correlated to the importance of the parking lots. Because Reber's appraisal failed to appreciate this correlation, it should not have been used by the Tax Court as a standard to evaluate the rental payments made to Sparks Development.

Although the importance of the parking lots to the casino's success cannot be discounted, it is not a true reflection of the evidence to correlate the two together. At trial, General Manager John Ascuaga twice indicated "that parking and fine food were [the] two big reasons for [the casino's] success." Additionally, the casino, which was the recipient of R. L. Graves' managerial talents, provided lounge entertainment to its customers. In short, the evidence clearly indicates that credit for the financial success enjoyed by the casino was to be shared by a host of factors. Accordingly, we glean no error from appraiser Reber's failure to consider the rate of return in calculating his computations.

Equally unpersuasive is the taxpayer's complaint that the Tax Court ignored the testimonial opinions of Ascuaga and R. L. Graves that the rent for the parking lots was "fair." The Tax Court's refusal to give great weight to the views opined by Ascuaga and R. L. Graves is embedded in the strong evidentiary inference that self-interest motivated the espousal thereof. Ascuaga and Graves, who were long-time business associates, each, no doubt, had special reason to vouch for the fairness of the rental terms. Simply stated, Ascuaga's concern was to have use of the parking lots and R. L. Graves was intent on Challenger being able to deduct in full the rent paid in 1959 and 1960. Under these circumstances, it was not unreasonable for the Tax Court to have trepidations about their testimony. See, Simon v. C. I. R., 285 F.2d 422 (3rd Cir. 1960); Midland Ford Tractor Co. v. C. I. R., 277 F.2d 111 (8th Cir. 1960).

As indicated above, the Graves also challenge the Tax Court's conclusion that those portions of the rental payments made by Challenger not deductible under Section 162 constitute constructive dividends. According to the Graves, no such dividend can be attrib-

utable to them because they were not the beneficiaries of these payments. Illustrative of this point is said to be the holding in Holsey v. C. I. R., 258 F.2d 865 (3rd Cir. 1958). There, the taxpayer, a 50% owner of the Holsey Company, assigned his option to purchase from the Greenville Company the remaining 50% of Holsey to that company, which in turn, exercised the option for $80,000. The end result of this transaction was that the taxpayer became the sole shareholder of Holsey. The Tax Court sustained the Commissioner's ruling that Holsey's purchase of the outstanding stock for $80,000 (taxpayer had initially purchased a 50% interest in Holsey for $11,000) was "essentially equivalent to the distribution of a taxable dividend to the taxpayer." The Third Circuit disagreed with this assessment, holding that the indirect benefit inuring to the taxpayer (he now "had 100% of the outstanding stock and the Greenville Company none") "could not give rise to taxable income . . . until the corporation makes a distribution to the taxpayer or his stock is sold." Finding no "direct pecuniary benefit to the taxpayer" resulting to the taxpayer as a consequence of this transaction, the Court held "the Tax Court erred in holding the distribution in question taxable to him."

In Niederkrome v. C. I. R., 266 F.2d 238 (9th Cir. 1958) cert. denied, 359 U. S. 945, 79 S.Ct. 725, 3 L.Ed.2d 678 (1959), this court, in dictum, approved the reasoning of Holsey.

The Graves argue that Challenger's rental payments constituted contributions to capital, as provided for in Section 362(c), to its sister corporation. Because the Challenger "benefited from the use to which the recipients put the rentals" (paying the bank loan and taxes which Challenger would have had to pay had it purchased the lots), the Graves maintain this case comes within the purview of the rule that capital contributions to a corporation by a non-shareholder arise when he receives a reciprocal benefit therefrom. Brown Shoe Co., Inc., v. C. I. R., 339 U.S. 583, 70 S.Ct.

820, 94 L.Ed. 1081 (1950); Edwards v. Cuba Railroad Co., 268 U.S. 628, 45 S. Ct. 614, 69 L.Ed. 1124 (1925).

The argument propounded by the Graves does not, in our view, appreciate the significant differences between the case at bar and those upon which they rely. In Holsey and Niederkrome, the courts were impressed with the fact that an "economic or financial advantage" was not determinable merely by securing corporate control. Although they acknowledged that there was a real possibility that such "advantages" would flow as a result of this control, the courts were hesitant to declare that this was an *ipso facto consequence.* As noted by this court, the profits gained from the sale of these shares were taxable, as well as any surplus which might accumulate during the years. In sum, the courts saw no need to engage in financial speculation, when the shareholders remained bound to the taxman when their gains from the transactions were actually realized.

By contrast, the Graves *have* obtained immediate benefits from this leasing agreement. The nature of these benefits was summarized by the Tax Court:

"Similarly, when he [R. L. Graves] established the rental to be paid to Sparks Development for the use of the Parking Lots, it was set high enough to provide the funds necessary to pay off the obligations incurred in the purchase of the Parking Lots. Had the rentals been set at a lower figure —at the amount which would have been paid in the market place for the rental of such Parking Lots, it would have been necessary for Sparks Development to have secured additional capital in some other manner, for example, by contributions from Mr. Graves. In other words, as a result of the payment of excessive rentals, the equity in Sparks Development . . . was increased, and when the Challenger stock was sold to the Ascuagas, the Graves were left with [a] valuable corporation, Sparks Development. . ."

The arrangement devised by R. L. Graves is similar to one recently condemned by the Fifth Circuit. In Sammons v. United States, 433 F.2d 728 (5th Cir. 1970), the taxpayer received a constructive dividend as a result of transferring stock between corporations which he either controlled or owned outright. The pertinent facts are these: American Republic, a corporation indirectly controlled by the taxpayer, purchased the fixed assets of Atlanta Fulton while the other assets were acquired by Texas Fulton, which was owned by five corporations controlled by the taxpayers. The fixed assets were then leased by American Republic to Texas Fulton which commenced the operation of the multi-bag business heretofore operated by Atlanta Fulton.

Thereafter, the five corporations already denoted sold their Texas Fulton stock at cost to Fidelity National, another of the taxpayer's corporations. Fidelity then sold its Texas Fulton stock to Westvaco and made a profit of $556,000.

The jury found that Fidelity National received a bargain purchase from its "brother" corporations in that the fair market value of Texas Fulton was greater than the amount paid by Fidelity National. Specifically, the jury found that the stock was worth $500,000 more than Fidelity National had paid, thus leaving the taxpayer liable for taxes on this sum as a constructive dividend. The Fifth Circuit upheld the District Court's approval of the jury's finding:

"In conclusion, we hold that Mr. Sammons received a constructive dividend when he moved the paper bag business between wholly-owned or controlled corporate entities at a price which the jury reasonably concluded to be one-half million dollars below fair market value. In reality then, the taxpayer took money from his five corporations and placed it in a sixth. It is of little consequence that he personally received no money from the transaction, for it is the power to dispose of income and the exercise of that power that determines whether taxable income has been received."

Samons v. United States, supra.

■ Similarly, we find no merit in the contention that Challenger's excessive rental payments can be viewed as contributions to capital. As indicated by the Tax Court, there is no evidentiary basis to support such a proposition because no benefit flowed to Challenger as a result therefrom:

"Challenger could expect no benefit to itself from the payment of the excessive rentals. Indeed, . . . Challenger derived no benefit from the fact that its excessive rentals enabled Sparks Development to pay off quickly the loans incurred in purchasing the Parking Lots. It seems altogether clear that if Challenger had been independent from control by the Graves, it would have had no reason to make capital contributions to [a corporation] which received the excessive rentals. They were paid because Mr. Graves willed it so, not because Challenger benefited thereby."

In March of 1955, Challenger leased 100 slot machines from Pub, Inc., Saratoga Club, Inc., and United Waldorf, Inc., three corporations wholly owned by the Graves. This lease continued in effect with terms unchanged until October 1, 1960, when the machines were sold to Challenger for $200 per machine. In accordance with the terms of the lease, Challenger paid these corporations $97,336.07 and $103,821.15 respectively, for the taxable years 1959 and 1960. In Challenger, Inc., 23 TCM 2096 (1964), the Tax Court held that the reasonable rental value of the slot machines did not exceed $2.59 per machine per month for the taxable years 1955 through 1958. Accordingly, the Tax Court sustained the Commissioner's disallowance as rental deduction those amounts which exceeded the machines' true value. The Tax Court below held that by virtue of this prior decision against their wholly-owned corporation, Challenger, the

Graves were collaterally estopped from relitigating the reasonable rental value of the slot machines for the years 1959 and 1960. As a consequence thereof, the Graves were charged with constructive dividends for those portions of the rental payments which exceeded the reasonable rental value of the slot machines.

R. L. Graves has challenged the Tax Court's application of collateral estoppel, maintaining in part, that his status of Challenger's controlling shareholder is not a basis upon which privity may be established. The nature of this challenge has long troubled the courts. Read in broad terms, there are a host of decisions which support or reject the view advanced by this taxpayer.[3] Confronted with this Solomon-like task, we have found most persuasive the common-sense reasoning set forth by Professor Moore: "It would seem that the public policy underlying the doctrine of res judicata, as a bar to repetitious litigation, would support a finding of privity between a close corporation and its sole or controlling stockholder." 1B Moore's Federal Practice (2d ed.), par. O.422[3].

 Given the establishment of the Graves' privity[4] with Challenger, we are satisfied that the Tax Court's invocation of the collateral estoppel doctrine was entirely appropriate. As indicated, the Tax Court's decision in *Challenger* set forth the reasonable rental value of the slot machines. In the interim between that decision and the one now in controversy, nothing has occurred regarding

relevant facts or principles of law which could be deemed of such significance to deny application of the doctrine. Accordingly, we find no error in the Tax Court's finding of constructive dividend with regard to the unreasonable portions of rent paid for the use of the slot machines.[5]

Affirmed.

3. See generally, Foreign & Domestic Music Corp. v. Licht, 196 F.2d 627 (2d Cir. 1952); Hornstein v. Kramer Bros. Freight Lines, 133 F.2d 143 (3rd Cir. 1943). By contrast, see generally, In Re Shea's Will, 309 N.Y. 605, 132 N.E.2d 864 (1956); D. Bruce Forrester, 4 T.C. 907 (1945).

4. Flora Graves asserts that collateral estoppel cannot be applied to her because title in the Challenger's stock was in the name of her husband, R. L. Graves. Because Nevada is a community property state (see Nev.Rev.Stat., §§ 123.220, 123.-225) we must disagree with this assertion.

As the owner of one-half the community, Mrs. Graves had an equal interest with her husband in the Challenger stock. For this reason, we believe it reasonable to apply the reasoning of Professor Moore to such an interest.

5. In so finding, we adopt the Tax Court's analysis rejecting the contention these payments constituted contribution to capital: "Challenger could expect no benefit to itself from the payment of the excessive rentals. Indeed, it could have purchased the slot machines with the amounts it paid each year for the rentals . . . ."