S & S MEATS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
S & S Meats, Inc. v. Commissioner
Docket No. 6853-77.
United States Tax Court
T.C. Memo 1979-163; 1979 Tax Ct. Memo LEXIS 361; 38 T.C.M. (CCH) 706; T.C.M. (RIA) 79163; April 25, 1979, Filed Robert D. Heidel and Frederic J. Brouner, for the petitioner. Scott R. Cox, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency of $12,284 in petitioner's Federal income tax for the taxable year ending January 31, 1974. Petitioner has conceded the correctness of all but one of the adjustments made by respondent in the notice of deficiency, leaving for our resolution the determination of the fair rental value of a meat processing plant leased to petitioner by its sole shareholder. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, S. & S Meats, *362 Inc., a Wisconsin corporation, had its principal office in Stoughton, Wisconsin at the time of the filing of its petition in this case. Petitioner timely filed its tax return for the taxable year ending January 31, 1974, with the Internal Revenue Service Center, Kansas City, Missouri. Petitioner is engaged in a meat processing business. Duane Hestnes is the sole shareholder of petitioner. Prior to August 31, 1972, when petitioner was incorporated, Mr. Hestnes operated the business now operated by petitioner as a proprietorship. When petitioner was incorporated, Mr. Hestnes retained the land, the building, and the heavy equipment used by petitioner. He transferred to petitioner small tools and various miscellaneous items. Pursuant to an oral lease entered into on February 1, 1973, Mr. Hestnes leased the building and machinery therein to petitioner at an annual rent of $24,000, payable in monthly installments of $2,000. The amount of rent was determined by Mr. Hestnes's accountant, and Mr. Hestnes did not know on what basis the rent was determined. Mr. Hestnes pays the taxes on the property, while petitioner is responsible for the insurance and general running expenses of *363 the building. Mr. Hestnes constructed the plant when he started the meat processing business in 1965. Most of the equipment was purchased in 1965 and 1966. Between 1967 and 1971 there were three additions to the plant, consisting of enclosed holding pens, an inedible cooler for condemned carcesses and inedible parts, and an offal room. The building is one-story and is of masonry construction. It is located on approximately one-half acre of land in an industrial park in Stoughton, Wisconsin, a town with a population in the neighborhood of 6,000. Stoughton is approximately 16 miles from Madison, the State capital. The building has in the neighborhood of 6,000 square feet. It is specifically designed for a meat processing business. It has high ceilings specially constructed for a conveyer. There are special areas where animals are slaughtered and where meat is cut and boxed. The operation requires extensive use of coolers where meat is aged, frozen and cured. In addition, there are areas where the animals are held prior to slaughter and where waste products are kept. There are also areas used for offices and for lounges by the employees. Petitioner's business is subject *364 to stringent State and Federal regulations, and the building requires a great deal of maintenance. The area where the animals are slaughtered must be sterilized four to eight times every day. A veterinarian and an inspector are stationed at the plant full time. In 1977, for real estate tax purposes, the land on which the building sets was assessed at $2,500. The improvements were valued at $51,500, for a total of $54,000. The assessment level was 107 percent. Mr. Hestnes included in income on his individual income tax return the amounts received from petitioner as rent. He also claimed depreciation deductions with respect to the building and machinery. On his individual income tax return for the calendar year 1970, Mr. Hestnes claimed that for purposes of depreciation the basic cost of the building was $54,888. On his individual return for 1972, Mr. Hestnes showed the cost of the building, including additions thereto, as $77,568. On Schedule G (Depreciation) of petitioner's return for the year in issue, petitioner showed as the total cost for machinery and equipment owned by it the amount of $59,696. On his individual return for the calendar year 1972, Mr. Hestnes showed *365 a cost basis of $143,153 for all the property used in the meat processing business, including the building, owned by Mr. Hestnes and used by petitioner. On its Federal income tax return for the year in issue petitioner deducted $24,000 as rent. Respondent disallowed this deduction in part with the following explanation: For the taxable year ended January 31, 1974, you have not established that any amount in excess of $12,000.00 claimed as rent expense was an ordinary and necessary business expense or expended for the purpose designated. Therefore, for the taxable year ended January 31, 1974, taxable income is increased $12,000.00. OPINION Section 162(a)(3), I.R.C. 1954, [1] allows as a deduction amounts paid as -- rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. The fact that two parties label a payment as "rent," however, does not mean that it is automatically deductible. *366 Because of the potential for abuse, courts may closely scrutinize transactions between related parties to ascertain the reasonableness of the payments and thus determine the amount properly deductible as rent. Place v. Commissioner,17 T.C. 199 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953). Payments that are not reasonable may not really be "payments required to be made as a condition to the continued use or possession * * * of property," but rather may be disguised distribution of profits, for which no deduction is allowable. Sparks Nugget, Inc. v. Commissioner,458 F.2d 631 (9th Cir. 1972), affg. a Memorandum Opinion of this Court, cert. denied sub nom. Graves v. Commissioner,410 U.S. 928 (1973). The rent in this case was paid by a corporation to its sole shareholder. This close relationship between the parties, coupled with the lack of arm's-length bargaining, warrants close scrutiny of the transaction. Each party offered the testimony of an expert with respect to a reasonable rental for the property. Petitioner's expert determined the fair rental value *367 of the property as of February 1973 to be $20,400, while respondent's expert arrived at a figure of $12,000. Both witnesses commence their appraisals by determining the fair market value of the subject property. Petitioner's expert appraises the land at $9,648. Respondent's witness appraises the land at $2,500, the assessed valuation for ad valorem taxation. Petitioner's witness considered four sales in the Stoughton area during 1972 and 1973 in estimating the value of the land. The sales prices of these various parcels ranged from 43 cents per square foot to 74.8 cents per square foot. None of these sales, however, is truly comparable to the land in question. Two of the parcels used by petitioner's expert as comparable were located on Main Street. One tract had been sold for use of an apartment complex, and one sale consisted of "various lots" in a neighborhood of indeterminate character. The one parcel of land used by petitioner's expert which was located in the industrial park where petitioner's plant is located was apparently sold in 1976. The witnesses, however, disagree on the price at which this tract, the only true comparable, was sold. Petitioner's witness claimed *368 it was sold at $5,000 per acre, while respondent's witness claimed it was sold at $2,600 per acre. As a "comparable," respondent's expert witness relied upon the foreclosure sale of a meat packing business in Waterloo, Wisconsin, 18 miles from Madison. The building involved in that sale, however, was constructed around 1950 and the fixed equipment may have been in poor condition. None of the other comparables relied upon by respondent's expert are in any way comparable to the property here involved. In 1977, when land was assessed at 107 percent valuation, the land here involved was assessed at $2,500. In our view, the evidence here indicates that the land on which the plant leased to petitioner stands had a value in late 1972 and early 1973 of $2,500. Even if, as petitioner's expert testified, the last remaining parcel in the industrial complex in which the building leased to petitioner was located was sold in 1977 for $5,000 per acre, there is no explanation of why a half acre should be valued at over $2,500 as of late 1972 or early 1973. It would appear that a discount from the 1977 price rather than an increase would be required for a tract being valued as of a date 5 *369 years earlier. We find $2,500 to be a reasonable value for the land on which the plant leased to petitioner stands. Both appraisers based their determination of a reasonable rental for the property on a percent of its fair market value. Each of them determined the fair market value of the building and equipment by a replacement cost approach. Petitioner's appraiser estimates the building cost with its equipment to be $28.40 per square foot, for a total of $177,102 for the structure. Respondent's witness utilized an overall cost of $15.40 per square foot, for a total building replacement cost of $91,500. In analyzing the market value of the fixtures and equipment, respondent's witness determined that they were worth nothing. As above stated, petitioner's appraiser took these items into account in valuing the building. Respondent takes the position that the building's special features rendering it suitable for the operation of petitioner's business would require a reduction from the replacement cost in determining its market value. Respondent argues that if the tenant, petitioner, were to go out of business, the lessor would be left with a useless buioding. Consequently, *370 respondent argues, determination of fair rental value must be made without reference to the use and needs of a particular tenant and must be determined on the basis of what the property would bring if offered to the general renting public that would not want the special equipment. Petitioner takes the position that the special equipment should be considered in ascertaining the fair market value and that this determination should be made on the basis of the highest and best use of the building, i.e., as a meat processing plant. The focus of our inquiry is "whether the sum paid is in excess of what the lessee would have been required to pay had [it] dealt at arm's length with a stranger," Place v. Commissioner, supra at 203. The lessee here was in the meat processing business and needed a building adaptable to that purpose. In our view, the special purpose of the building, including the fixtures and equipment for a meat processing business, are factors to be considered in determining fair rental value.While it might be more difficult to find a new tenant for a special purpose building, certainly a fair rental value of the building should not be determined by *371 assuming, as respondent contends, that it could not be rented to a business for which it was suitable. We do, however, disagree with the manner in which petitioner's expert has allocated the additional costs to the building for such special items as offices, freezer, coolers, conveyors and scales. For example, petitioner's appraiser added an additional cost of $4.50 per square foot to the entire building for office space, even though there are only approximately 700 square feet of office space. Accordingly, in our view, petitioner's witness has somewhat overstated the replacement cost of the building. Using our best judgment, based on all the evidence, we find that the replacement cost of the building, including its equipment, as of the end of 1972 or beginning of 1973 was approximately $150,000. After arriving at the replacement cost of the building, respondent's expert applied a depreciation factor of approximately 40 percent, allocating 17-1/2 percent to physical depreciation, 17-1/2 percent to locational obsolescence and 5 percent to functional obsolescence. Petitioner's witness did not depreciate the building replacement cost for any type of obsolescence, even though *372 his report states that the building, as of February 1, 1973, had an effective age of 15 years and a remaining economic life of 15 years. In our view, respondent has correctly determined that after 7 years of heavy use some type of physical obsolescence would have occurred, and we find 17-1/2 percent (2-1/2 percent per year) to be a reasonable sum. We do not agree that any factor should be applied for economic obsolescence. Respondent's witness states that some degree of economic obsolescence would exist because the plant is located some distance from Madison, Wisconsin where most of petitioner's competitors and customers reside. Petitioner's business appears to be prospering at its present location, and we see no evidence of locational obsolescence. Finally, we do not agree that it is proper to depreciate the replacement cost by another 5 percent for functional obsolescence. Respondent's witness testified that this was done to account for floor tiling, which "was not the most modern." However, in our view, the wear and tear on the floor tiling has been accounted for in the depreciation for physical obsolescence. Accordingly, we arrive at the following value for the plant in late *373 1972 or early 1973: Land $ 2,500
Building
$150,000
Less Depreciation
(17-1/2 percent)
(26,250)
123,750
$126,250
Both experts agree that a reasonable return on investment is between 12 and 15 percent. Since the building contained equipment, in our view a percentage on the higher side of this investment return is appropriate. On the basis of all the evidence, we conclude that the annual fair rental value of the property is $18,000. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩