CLAIRTON SLAG, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clairton Slag, Inc. v. Commissioner
Docket No. 9759-77.
United States Tax Court
T.C. Memo 1979-485; 1979 Tax Ct. Memo LEXIS 39; 39 T.C.M. (CCH) 625; T.C.M. (RIA) 79485; December 5, 1979, Filed John D. Houston II, for the petitioner. Joseph M. Abele, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax against petitioner as follows: Taxable Year Ended
Deficiency
July 31, 1972
$16,320
July 31, 1973
16,320
July 31, 1974
16,320 The sole issue for our decision is whether the annual rental paid *40 by petitioner for the taxable years ending July 31, 1972, July 31, 1973, and July 31, 1974, was equal to or less than the fair rental value of the property leased and therefore deductible under section 162(a)(3), Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Clairton Slag, Inc. (herein petitioner) is a corporation organized under the laws of Pennsylvania. At the time of the filing of the petition in this case, its principal place of business was located 20 miles southeast of Pittsburgh, Pennsylvania, in Allegheny County. Petitioner filed its Federal income tax returns for the taxable years ended July 31, 1972, July 31, 1973, and July 31, 1974, with the Internal Revenue Service Center, Philadelphia, Pennsylvania. Petitioner is the product of the merger of Clairton Cinder Sales Company (hereinafter Cinder) and Clairton Tar and Asphalt, Inc. (hereinafter Asphalt), both of which were wholly owned by Michael M. Schaefer (hereinafter Schaefer). *41 The merger was consummated on July 1, 1971. Schaefer is the sole shareholder of petitioner. Petitioner operates a river terminal, manufactures asphalt, and paves roads with the asphalt it manufactures. The property which is the focal point of this controversy is a 24.799-acre tract of land located on the westerly bank of the Monongahela River approximately 20 miles southeast of Pittsburgh, Pennsylvania (hereinafter the Property). The Property is zoned "heavy industrial," and its highest and best use is as a heavy industrial site. Schaefer and his wife purchased the Property on February 26, 1965, for a consideration of $110,000. Schaefer improved the property during the years 1965 through 1969 by building a dock suitable for mooring barges. To construct this docking facility, Schaefer raised the level of the riverfront portion of the property by arranging with a company that dredged the river to dump its "fill" on the river frontage portion of the Property (for which privilege the dredging company paid Schaefer a fee). Used barges were then sunk and anchored to the land to as to the provide a docking facility. Cinder and Asphalt occupied the Property rent free from 1966 *42 until July 1, 1971 (the date of the above-mentioned merger); petitioner occupied the Property rent free from the time of the merger through July 31, 1971. During these periods of rent-free occupancy, Cinder and Asphalt made several improvements to the Property. In 1966, Cinder constructed on the Propety a two-story combination office building, garage, and warehouse at a cost of $62,516 and a small frame house of minimal value. In 1967, Asphalt constructed on the Property a one-story concrete block office building at a cost of $20,333. At various times in 1965, 1966, and 1967, Cinder and Asphalt laid asphalt on the Property covering an approximate area of 175,000 square feet. As of August 1, 1971, no other improvements had been made to the Property. A lessor of property similar to the Property would have required a 9-1/2 percent return on his investment upon leasing such property in an arm's-length transaction.
On August 1, 1971, the value of the Property, including the value of the land and the docking facility, was $947,500. The value of the Property increased five percent per year. Thus, the value of the Property on August 1, 1972 and on August 1, 1973 was, respectively, *43 $994,875 and $1,044.618.70. On August 1, 1971, Schaefer and petitioner executed a lease (the Lease) whereby Schaefer leased the Property to petitioner. The Lease provided for a five-year initial lease term, ending July 31, 1976, and an option to renew the Lease for another five-year term. The Lease called for a yearly rental of $84,000 payable annually in advance. Though petitioner was obligated under the terms of the Lease, to pay as extra rental any increase in property taxes over the calendar year 1972 assessment level of $6,141.87, it was not called upon to do so because the property tax assessments for the calendar years 1973 and 1974 were also $6,141.87. Thus the only rent payable for the first three years of the lease term was $84,000, which amount was paid during each of petitioner's three taxable years ending July 31, 1972, July 31, 1973, and July 31, 1974. Schaefer paid property taxes in the amount of $6,141.87 in each of the calendar years 1972, 1973, and 1974. Petitioner deducted as a rental expense $84,000 on its Federal income tax returns for each of those three taxable years. Respondent in his notice of deficiency to petitioner disallowed $34,000 of the claimed *44 $84,000 deduction, stating that the fair rental value of the Property for the taxable years in question as no greater than $50,000. At trial, respondent revised his estimate of the fair rental value of the Property. Respondent now contends that the fair rental value of the Property was $50,152.88 for the taxable year ended July 31, 1972; $53,152.88 for the taxable year ended July 31, 1973; and $55,152.88 for the taxable year ended July 31, 1974, and he seeks to disallow any deduction in excess of those amounts. ULTIMATE FINDING OF FACT The fair rental value of the Property for the taxable years ending July 31, 1972, July 31, 1973, and July 31, 1974, was not less than $84,000 per year. OPINION Petitioner leased 24.799 acres of riverfront property and its appurtenant docking facility from Schaefer. the sole stockholder of petitioner, at a yearly rent of $84,000. Petitioner deducted that amount on its Federal income tax returns for the taxable years ending July 31, 1972, July 31, 1973, and July 31, 1974. From this deduction arises the controversy we are now asked to decide. Respondent contends that the rent paid was excessive and that the deduction for rent expense for *45 those three taxable years should be limited to $50,152.88, $53,152.88, and $55,152.88, respectively. The principles governing this area of the tax law are undeniably well settled. Under both the 1939 Internal Revenue Code and the present Code, only "rentals * * * required to be made as a condition to the continued use or possession, for purposes of a trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity" are deductible. Sec. 23(a)(1), I.R.C. 1939; Sec. 162(a)(3). [Emphasis added.] Usually, the push and pull of the market place will ensure that only those rentals "required" to be paid will be paid. However, when the lessor and lessee are closely related and there is no arm's-length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's-length with the lessor. Place v. Commissioner,17 T.C. 199 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953); Sparks Nugget, Inc. v. Commissioner,458 F.2d 631 (9th Cir. 1972), *46 cert. denied 410 U.S. 928 (1973); Forman Company, Inc. v. Commissioner,453 F.2d 1144 (2d Cir. 1972), cert. denied 407 U.S. 934 (1972), rehearing denied 409 U.S. 899 (1972); Stanwick's Inc. v. Commissioner,190 F.2d 84 (4th Cir. 1951); Limericks, Inc. v. Commissioner,165 F.2d 483 (5th Cir. 1948); Potter Electric Signal & Mfg. Co. v. Commissioner,286 F.2d 200 (8th Cir. 1961); Herbert Davis v. Commissioner,26 T.C. 49 (1956). Inasmuch as the self-serving statements of the parties to the lease will rarely provide an insight as to what rental would have been required, courts have often been called upon to determine what constitutes a reasonable rental, i.e., what the fair rental value of the leasehold is. In a lease between related parties not dealing at arm's-length, any amount paid as a purported rental in excess of the fair rental value of the leased premises is not a "rental" as defined in section 162(a)(3) and is not deductible as such. Therefore, this Court's task is clear. We must determine the fair rental value of the Property. The burden of proving *47 this amount is petitioner's to bear. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule u42(a), Tax Court Rules of Practice and Procedure. The location of this burden, and the consequences of petitioner's failure to shoulder it, were aptly stated in Place v. Commissioner,17 T.C. 199, 204 (1951): [It] is incumbent on him [petitioner] to establish that the sums were in fact rentals he would have been required to pay had he dealt at arm's-length with a stranger. To do so, he must show that the sums were reasonable in amount. If the reasonableness of this or some lesser sum is not shown, then the sum respondent has determined to be the maximum petitioner would have been required to pay must stand when, as here, it is not patently inadequate. [Citations omitted.] In the instant case, the parties sought to prove the fair rental value of the Property by offering expert testimony which tended to support their positions. Both petitioner's expert witness, Mr. Leo B. Shapero, and respondent's expert witness, Mr. Leonard S. Rodwin, possessed a great deal of expertise in the general field of commercial real estate appraisal as evidenced by the *48 outstanding academic credentials and extensive appraisal experience which they both possessed. If both were placed in an unfamiliar city, we have no doubt that both would be equally skilled at determining the fair rental value of a tract of commercial realty. However, when we take into account the fact that petitioner's expert was a native of Pittsburgh and had appraised a multitude of commercial properties in and around the Pittsburgh area for over 30 years, as contrasted with the fact that respondent's expert had previously appraised only two properties near Pittsburgh, neither of which was riverfront property, the scales of credibility tip significantly in favor of petitioner's expert. [2] Thus, in areas of disagreement between the experts concerning local factors that would affect the valuations rendered, we will tend to give greater credence to the testimony of Mr. Shapero, petitioner's expert witness.
Of course, the best method for determining the fair rental value of the Property would be to locate a similar parcel which had been the subject of *49 a lease between unrelated parties on or about August 1, 1971, the date the Property was leased to petitioner by Schaefer. However, neither party produced evidence of such leases, being in agreement that no such leases had been entered into in the Pittsburgh area. The parties were further in agreement that, inasmuch as no comparable leases were available from which to extrapolate the fair rental value of the Property, the next best method for determining the fair rental value of the Property is the "comparable sales" method (CSM). The CSM requires the identification of two relevant figures: (1) the rate of return on investment an unrelated lessor of comparable property would require; and (2) the fair market value of the subject property at the beginning of each lease year. The fair market value of the subject property is derived by identifying other similar tracts that have been the subject of arm's-length sales (comparable sales) and then taking the price paid for those tracts and adjusting it up or down to take into account differences in location and topography between the subject property and the comparable sales properties. A further adjustment is made for general price *50 level changes between the date the comparable sales properties were sold and the relevant valuation date of the subject property. Thus, by adjusting sales prices of properties that undoubtedly changed hands at arm's-length, one can derive a reasonable approximation of what the fair market value of the subject property was as of the relevant valuation date. The fair market value determined is then multiplied by the required rate of return to arrive at a reasonable rental figure for that year. The Court agrees with the parties that this is a reasonable method for determining the fair rental value of the Property and, thus, will use that method in the instant case. Though the parties expended much effort in proving the second prong of the above-described calculus (the fair market value of the Property), the first prong of the equating (the appropriate rate of return) was woefully neglected by the parties' advocates. Each side merely presented summary explanations of the rate they deemed appropriate and the methods used to derive such rates. No direct statements can be found in the record which even assert, let alone prove, that one method is superior to the other. Thus, the Court's *51 finding of fact with regard to the appropriate rate of return must be rendered in a vacuum of advocacy. Petitioner's expert contends that 9-1/2 percent is the appropriate rate of return in this case. He establishes such rate by using a "build-up" method which starts with a basic "safe" rate of return and builds in other factors to arrive at an appropriate rate. Petitioner's expert determined that the "safe" rate was 6 percent. He then built in an additional 1 percent required return for additional risk, an additional 2 percent required return for the non-liquidity involved in land investment, and an additional 1/2 percent required return for the burden to Schaefer of managing the property. The sum of these rates is 9-1/2 percent. Respondent's expert contends that 9-1/4 percent is the appropriate rate of return in this case. He offered two methods for determining the appropriate rate of return. First, he equated investing in industrial land in the Pittsburgh area with investing in a BAA rated corporate bond, which on August 1, 1971, carried an average yield of 8.76 percent (according to respondent's expert). An additional 1/2 percent of required return was tacked on to this *52 rate to take into account the non-liquidity of land. Thus, respondent's expert's first method yielded a required rate of return of 9.26 percent. It is significant that no proof was offered to explain why the nature and risk of investing in the land in question resembles the nature and risk of investing in a BAA corporate bond. Nor was any direct evidence introduced to prove the BAA corporate bond rate on August 1, 1971. The other method used by respondent's expert is called the "band of investment" method. Under this method, one must estimate the percentage of the purchase price of similar land that a lender would finance, the rate of return the lender would require, and the rate of return the owner would require on his equity. By weighting these rates of return according to the percentage of investment that each interested party (lender and owner) has invested in the property, an average required rate of return on the whole property can be calculated. Respondent's expert posited that a lender in 1971 would have lent two-thirds of the purchase price of land similar to the Property at an interest rate of 7-3/4 percent and that an investor would require a 12 percent return on *53 his equity investment. These assumed figures are then used thusly: 2/3X.0775=
.0517
1/3X.12=
.04
Overall required
rate of return
.0917
This method is certainly sound in an econometric sense; however, the multitude of assumptions entailed in the use of such method renders it far too theoretical and abstract for judicial use. Inasmuch as respondent's expert stated at trial that his "BAA bond equivalency" method was a mere embellishment on the "build-up" method of petitioner's expert and that the two methods were substantially equivalent, this Court will embrace, for the purposes of this case, the method used and the result obtained by petitioner's expert. The rate of return that would have been required by an unrelated lessor of property similar to the Property is 9-1/2 percent. In seeking to determine the relevant fair market value of the Property, which is the figure by which the 9-1/2 percent rate of return will be multiplied, the focal date is August 1, 1971, the date of the signing and commencement of the Lease. The parties' experts agreed that the value of the Property would increase 5 percent per year. Thus, in determining the fair market value *54 for the second lease year, we need only increase the determined fair market value of the Property on August 1, 1971, by 5 percent. Similarly, the fair market value of the Property as of the beginning of the third lease year will be 105 percent of the fair market value of the Property as of the beginning of the second lease year. Therefore, it is evident that all of the figures relevant to the second prong of the CSM are dependent on our determination of what the fair market value of the Property was as of August 1, 1971.
The value of the Property as it existed on August 1, 1971, was actually attributable to two major components: (1) the land itself, disregarding the buildings and asphalt added to the Property during the rent-free tenancies prior to August 1, 1971 (Schaefer did not own those improvements); and (2) the dock constructed on the riverfront by Schaefer. When using the CSM to derive the fair market value of a property, the other properties examined must, by definition, be comparable to some extent to the property which is being valued. Since none of the properties examined by petitioner's expert had, on the dates they were sold, docking facilities comparable to the one *55 existing on the Property, he used the CSM to arrive at the fair market value of only the land component of the Property. He then separately determined the value of the dock. Respondent's expert, on the other hand, made no separate allowance for the value of the dock. Admittedly, this omission would not be significant if all of the properties which he deemed to be comparable to the Property had had docking facilities comparable to those on the Property as of the date each of them were sold. However, respondent's expert failed to recognize that the relevant date for observing the supposedly comparable properties is the date of their sale. He testified that the four properties he deemed to be comparable had docking facilities (of an unknown quality) as of the date of trial, which is irrelevant. He had no knowledge of the existence, or lack thereof, of docking facilities on those properties as of the date of their sale. This blemish on the methodology of respondent's expert severely taints his valuation. Petitioner's expert identified ten comparable sales in his report. After appropriate adjustment, he valued the land at $760,000. Respondent identified four comparable sales *56 in his report, two of which are of questionable value because of the possibility that the sales involved were at less than arm's-length. After appropriate adjustment he valued the Property--land and dock--at $480,000. After reviewing the testimony of the experts for both parties, we are convinced that petitioner's expert witness rendered a more accurate estimate of the value of the land component of the fair market value of the Property. We find that the value of the land component of the Property on August 1, 1971, was $760,000. Petitioner estimated the value of the dock on August 1, 1971, to be $187,500. Respondent tried to cast some doubt on the validity of this estimate, but failed to produce any alternative evidence which would provide us with the basis for making an alternate valuation. Considering respondent's expert's previously mentioned misconceptions concerning when docking facilities must have existed on the properties he deemed comparable, respondent's failure of proof concerning the value of the dock is explicable; however, such omission, though understandable, provides no opposition to the testimony of petitioner's expert that the dock was worth $187,500 on *57 August 1, 1971. The valuation rendered by petitioner's expert is not patently excessive. Therefore, petitioner has carried his burden of proof; the value of the dock on the Property on August 1, 1971, was $187,500. The value of the Property on August 1, 1971, adding the $760,000 value of the land to the $187,500 value of the dock, was $947,500. Allowing for a 5 percent increase per year, the value of the Property on August 1, 1972, was $994,875 (105 percent of $947,500) and on August 1, 1973, was $1,044,618.70 (105 percent of $994,875). To arrive at the fair net rental value of the Property for the taxable years involved, we must multiply the fair market value of the Property at the beginning of each taxable year by the rate of return that an unrelated party would require (9-1/2 percent): FMV of the Property
Taxable Year
at Beginning of
Required Rate
Fair Net
Beginning
Taxable Year
of Return
Rental Value
August 1, 1971 $ 947,500.00
9-1/2%
$90,012.50
August 1, 1972
994,875.00
9-1/2%
94,513.13
August 1, 1973
1,044,618.70
9-1/2%
99,238.77 Furthermore, to produce a true 9-1/2 percent return on Schaefer's investment, he should also be *58 reimbursed for the yearly real estate taxes in the amount of $6,141.87 that he paid on the Property. Thus, the fair rental which an arm's-length lessor would have charged for the use of the Property would have included this additional $6,141.87, producing a total fair rental amount in the three taxable years involved of $96,154.37, $100,655.00, and $105,380.64. Applying the standard found in Place v. Commissioner,17 T.C. 199 (1951), since the yearly amounts of $84,000 paid by petitioner to Schaefer for the continued use of the Property did not exceed the fair rental value of the Property in any one of the three taxable years in issue, such payments were "required" as that word is used in section 162(a)(3). Therefore, the amounts paid are deductible in their entirety. Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Bormes v. Commissioner,T.C. Memo 1974-65, affd. per curiam 512 F.2d 442↩ (8th Cir. 1975).